# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2011AP1044-CR & 2011AP1105-CR |
| COMPLETE TITLE: | State of Wisconsin,<br>　　　　Plaintiff-Respondent,<br>　　v.<br>Dale R. Neumann,<br>　　　　Defendant-Appellant.<br>------------------------------------------------<br>State of Wisconsin,<br>　　　　Plaintiff-Respondent,<br>　　v.<br>Leilani E. Neumann,<br>　　　　Defendant-Appellant. |

ON CERTIFICATION FROM THE COURT OF APPEALS

| | |
|---|---|
| OPINION FILED: | July 3, 2013 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | December 4, 2012 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Marathon |
| JUDGE: | Vincent K. Howard |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | |
| DISSENTED: | PROSSER, J., dissents. (Opinion filed.) |
| NOT PARTICIPATING: | |

ATTORNEYS:

For the defendants-appellants, there were briefs in the court of appeals by *Steven L. Miller* and *Miller & Miller*, River Falls, and *Byron C. Lichstein*, *Erin K. Deeley*, with assistance from law student practitioner *Willam R. Ackell*, and *Frank J. Remington Center,* Madison. Oral arguments by *Mr. Lichstein* and *Mr. Miller*.

For the plaintiff-respondent, the cause was argued by *Maura F.J. Whelan*, assistant attorney general, with whom on the briefs in the court of appeals was *J.B. Van Hollen*, attorney general.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No.   2011AP1044-CR & 2011AP1105-CR
(L.C. No.   2008CF324 & 2008CF323)

STATE OF WISCONSIN      :      IN SUPREME COURT

**State of Wisconsin,**

      **Plaintiff-Respondent,**

  **v.**

**Dale R. Neumann,**

      **Defendant-Appellant.**

_____

**State of Wisconsin,**

      **Plaintiff-Respondent,**

  **v.**

**Leilani E. Neumann,**

      **Defendant-Appellant.**

**FILED**

**JUL 3, 2013**

Diane M. Fremgen
Clerk of Supreme Court

APPEAL from judgments and orders of the Circuit Court for Marathon County, Vincent K. Howard, Judge.  *Affirmed.*

¶1   SHIRLEY S. ABRAHAMSON, C.J.   Eleven-year-old Madeline Kara Neumann died tragically on Easter Sunday, March 23, 2008, from diabetic ketoacidosis resulting from untreated juvenile

onset diabetes mellitus.[1] Kara died when her father and mother, Dale R. Neumann and Leilani E. Neumann, chose to treat Kara's undiagnosed serious illness with prayer, rather than medicine. Each parent was charged with and convicted of the second-degree reckless homicide of Madeline Kara Neumann in violation of Wis. Stat. § 940.06(1) (2009-10),[2] in separate trials with different juries.

¶2 Each parent appealed from the judgment of conviction of the Circuit Court for Marathon County, Vincent K. Howard, Judge.[3]

¶3 The court of appeals consolidated the cases for appellate decision only.[4] The appeals are before us on certification from the court of appeals pursuant to Wis. Stat.

---

[1] Madeline Kara Neumann was called Kara during her life and throughout the trials and will be referred to as Kara in this opinion.

[2] Although the jury trials occurred in 2009, all references to the Wisconsin Statutes are to the 2009-10 version unless otherwise indicated, as it is the same as the version of the statutes in effect at the time of trial.

The cases were tried separately upon the State's motion.

[3] Each parent also sought postconviction relief pursuant to Wis. Stat. §§ 809.30 and 974.02. The circuit court denied the motions for postconviction relief. These orders are also the subject of this appeal.

[4] The parents were each represented by their own counsel at their separate trials and in this court, and their respective counsel filed separate briefs. Counsel for the parents divided their 35-minute oral argument, each attorney handling an issue on behalf of both parents as well as the issues distinctive to the parent whom counsel represented.

§ 809.61 to "determine the scope of the prayer treatment exception and to inform trial courts regarding the appropriate jury instructions when that exception is raised in a reckless homicide case."[5]

¶4    The first issue, common to both parents, is whether their convictions should be reversed (and the charges dismissed) on the ground that the prosecutions for second-degree reckless homicide under Wis. Stat. § 940.06(1) were unconstitutional, when Wis. Stat. § 948.03(6) permitted them to treat Kara's illness with prayer and protected them from a criminal charge under § 948.03, the criminal child abuse statute.[6]

¶5    The parents contend that their treatment through prayer is expressly protected by one statute, Wis. Stat. § 948.03(6) (protection for treatment through prayer),[7] but

---

[5] State v. Dale R. Neumann, No. 2011AP1044-CR, & State v. Leilani E. Neumann, No. 2011AP1105-CR, unpublished certification (Wis. Ct. App. May 1, 2012).

This consolidated appeal raises several issues.   Some issues are common to the convictions of both parents, although each parent has employed different arguments or reasoning in this court.   To the extent that an issue affects both parents, we take into account both of their positions in discussing and deciding the issue.   To the extent that an issue affects only one parent, we identify and decide the issue accordingly.

[6] Wis.  Stat.  § 948.03.    The  title  of  the  statute  is "Physical abuse of a child."   We will refer to § 948.03 as the criminal child abuse statute to distinguish it from other state or federal statutes that relate to child abuse.

[7] Wisconsin Stat. § 948.03(6) reads:

Treatment through prayer.   A person is not guilty of an  offense  under  this  section  [§ 948.03]  solely because he or she provides a child with treatment by

criminalized by another, § 940.06(1) (second-degree reckless homicide), and that the statutes fail to provide them with fair notice, in violation of their due process rights, that they could be held criminally liable should their treatment through prayer fail and their child die.[8]

¶6 Each parent also argues alternative grounds of prejudicial trial error. The arguments for reversal of the convictions and for a remand for new trials are as follows:

- Both parents argue that the real controversy was not fully tried because of erroneous jury instructions and because of counsels' defective performance.

- The father argues that the jury was objectively biased because it was informed that Kara's mother had

---

spiritual means through prayer alone for healing in accordance with the religious method of healing permitted under s. 48.981(3)(c)4. or 448.03(6) in lieu of medical or surgical treatment.

The attorneys referred to Wis. Stat. § 948.03(6), the provision protecting treatment through prayer, as a privilege, although they acknowledged it could be characterized as an exception, a defense, or an immunity. We view it as a protection from prosecution under Wis. Stat. § 948.03.

[8] The father's brief appears to argue that the reckless homicide statute is facially unconstitutional in combination with the treatment-through-prayer provision, although at times his argument appears to be an "as-applied" challenge. The mother's brief argues that the reckless homicide statute is unconstitutional as applied to her circumstances. An as-applied argument was made at oral argument. Nevertheless, at times the implication of the mother's as-applied argument is that the interplay of the statutes renders the statutes facially unconstitutional.

previously been convicted of second-degree reckless homicide for Kara's death.

¶7 For the reasons set forth, we conclude that the second-degree reckless homicide statute and the criminal child abuse statute provide sufficient notice that the parents' conduct could have criminal consequences if their daughter died. We further conclude that the jury instructions were not erroneous; that trial counsels' performance was not ineffective assistance of counsel; that the controversy was fully tried; and that the jury in the father's case was not objectively biased.

¶8 Accordingly, we affirm the judgments of convictions and orders denying postconviction relief.

¶9 Here is a roadmap of this decision for ease of reference:

I.   The facts.  ¶¶10-30.

II.  Due Process Fair Notice Challenge.  ¶¶31-86.

   A. Due process requires fair notice of the crime. ¶¶32-37.

   B. The four statutes at issue are Wis. Stat. §§ 940.06(1), 948.03(3)(a), 948.03(3)(c), and 948.03(6). ¶¶38-46.

   C. The parents' challenge to the constitutionality of the statutes is that the statutes do not provide a definite enough standard of conduct and that one criminalizes the same conduct the other protects. ¶¶47-61.

   D. The statutes fulfill the due process fair notice constitutional requirement. ¶¶62-86.

III. The Real Controversy Was Fully Tried.  ¶¶87-147.

5

A. The challenge to jury instructions on parent's duty to provide medical care.  ¶¶93-121.

1.   A parent has a legal duty to provide medical care to his or her child.  ¶¶103-111.

2.   The instructions on a parent's legal duty do not violate a parent's constitutional right to direct the care of his or her child.  ¶¶112-117.

3.   The statutory provision protecting treatment through prayer, Wis. Stat. § 948.03(6), does not negate the legal duty to provide medical care in a second degree reckless homicide prosecution.  ¶¶118-121.

B. The challenge to jury instructions on religious belief.  ¶¶122-127.

C. The challenge to the circuit court's refusal to instruct on sincere religious belief.  ¶¶128-140.

D. The Challenge that counsels' performances were ineffective assistance of counsel and resulted in the real controversy not being fully tried. ¶¶141-147.

IV. The Father's Claim That the Jurors Were Objectively Biased.  ¶¶148-160.

I

¶10 According to the undisputed testimony, the facts relating to the child's health and the parents' conduct were essentially the same in each jury trial and are set forth here.

¶11 Madeline Kara Neumann died at 3:30 p.m. on Sunday, March 23, 2008, from diabetic ketoacidosis resulting from

untreated juvenile onset diabetes mellitus.[9] Kara had suffered gradually worsening symptoms for a few weeks before her death, leading to frequent thirst and urination, dehydration, weakness, and exhaustion, yet to the casual observer, as the State and parents stipulated, Kara would have appeared healthy as late as the Thursday before she died.

¶12 On the Friday night before she died, Kara was too tired to finish her homework and ate her dinner in her bedroom. On Saturday, the day before her death, Kara slept all day after asking to stay home from work at the family's coffee shop. When her mother returned home from work Saturday afternoon, Kara was pale and her legs were skinny and blue. Her mother knew that something was wrong and called her husband into the room. The parents began rubbing Kara's legs and praying for her.

¶13 The Neumanns do not belong to any identifiable church or religious organization, but identify as Pentecostals. They believe that there are spiritual root causes to sickness and

---

[9] Although the instant cases are the first in Wisconsin to consider the effect of a treatment-through-prayer provision on the criminal culpability of a parent for a child's death, numerous other jurisdictions have considered this issue. Three of these jurisdictions have considered the issue when the child died of the same illness as Kara, diabetic ketoacidosis. See, e.g., Hermanson v. State, 604 So. 2d 775 (Fla. 1992); State v. McKown, 475 N.W.2d 63 (Minn. 1991); Commonwealth v. Nixon, 718 A.2d 311 (Pa. Super. Ct. 1998).

This court has once before considered a case in which this illness had fatal consequences, but that case involved a physician's liability for medical malpractice for failing to diagnose and treat the disease in a five-year-old child. See Maurin v. Hall, 2004 WI 100, 274 Wis. 2d 28, 682 N.W.2d 866.

that their prayer and strong religious beliefs will cure any health problems they encounter.

¶14 Kara's parents had not always relied only on spiritual healing in the past. All of their children were born in a hospital and vaccinated. The father went to a chiropractor for some ten years for back pain but believed that he was relieved of his pain through prayer. The parents decided not to go to doctors for treatment anymore, out of a belief that they would be "putting the doctor before God," amounting to idolatry and sin.

¶15 The father testified that he believed that his family's overall health had improved since the family had stopped going to doctors, and thus, when the parents realized that Kara was ill on Saturday afternoon, they began to pray.

¶16 Soon after the parents began to pray, they enlisted the help of others, calling family and friends asking them to pray for Kara as well. The father sent a mass e-mail at 4:58 p.m. on Saturday to a listserv of like-minded people, which read:

Subject: Help our daughter needs emergency prayer!!!

We need agreement in prayer over our youngest daughter, who is very weak and pale at the moment with hardly any strength.

¶17 The parents testified that they did not know specifically what was wrong with Kara, thinking it could be a fever or the flu, but they knew it was serious and needed attention, so they prayed. When informed of Kara's condition,

Kara's maternal grandmother suggested they take her to a doctor. The mother replied, "No, she'll be fine, God will heal her."

¶18 When the family took a break from prayer to eat dinner Saturday evening, Kara remained in bed. While the family ate, Kara went to use the bathroom. She fell off the toilet. Her father picked her up and carried her to the couch in the living room where they could watch her. The family stayed up late praying over Kara, until finally, the parents went to sleep because they "were exhausted . . . [from the] non-stop praying and just continually trusting in the Lord."

¶19 According to trial testimony, by the time the family went to sleep Saturday night, Kara was unable to walk or talk. Kara's brother Luke testified that he believed Kara was in a coma. Kara's siblings stayed with her throughout the night while she lay limp and unresponsive on the couch.

¶20 When her father awoke early Sunday morning, around 5:00 a.m., Kara was still pale, limp, unconscious, and unresponsive, although she sometimes moaned in response to friends and family members calling her name. Her breathing was less labored than it had been the previous night.

¶21 Kara's mother continued to call friends and relatives to tell them about Kara's condition and ask for prayers. Various people came by the home on Sunday to pray and later, in trial testimony, witnesses characterized Kara's condition as a coma. Still, family and friends testified that everyone was at complete peace and did not sense any danger in Kara's condition.

¶22  Kara's father testified that death was never on their minds.  He testified that he knew Kara was sick but was "never to the alarm of death," and even after she died, her father thought that Jesus would bring Kara back from the dead, as he did with Lazarus.

¶23  The parents and friends testified that the parents took tangible steps to help Kara.  The mother tried to feed Kara soup and water with a syringe, but the liquid just dribbled out of Kara's mouth.  The father tried to sit Kara up, but she was unable to hold herself up.  At some point, Kara involuntarily urinated on herself while lying unresponsive on the couch, so they carried her upstairs and gave her a quick sponge bath while she lay on the bathroom floor.

¶24  At one point, Kara's maternal grandfather suggested by telephone that they give Kara Pedialyte, a nutritional supplement, in order to maintain the nutrients in her body.  The mother responded that giving Kara Pedialyte would be taking away the glory from God.  Kara's mother had told another visiting friend that she believed that Kara was under "spiritual attack."

¶25  Friends Althea and Randall Wormgoor testified that they arrived at the Neumanns' home on Sunday at approximately 1:30 p.m.  The Wormgoors saw that Kara was extremely ill and nonresponsive.  Her eyes were partially open but they believed she needed immediate medical attention.  Randall Wormgoor pulled Kara's father aside and told him that if it was his daughter, he would take her to the hospital.  The father responded that the idea had crossed his mind, and he had suggested it to his wife,

10

but she believed Kara's illness was a test of faith for their family and that the Lord would heal Kara.

¶26  During this conversation, Althea Wormgoor noticed a distinct twitch from Kara's mouth, which startled her.  Thinking that Kara had stopped breathing, Randall Wormgoor called 911. Unbeknownst to those in the home, police and emergency medical personnel were already en route to the Neumann home, having received a call from Ariel Neff, the mother's sister-in-law in California, explaining that Kara might be in a coma and that her parents refused to take her to a doctor.  Ariel Neff's call was recorded at 2:33 p.m. on Sunday

¶27  Police and emergency medical personnel arrived to find the parents praying over their extremely skinny, pulseless daughter.  The paramedics transported Kara to the hospital, where attempts to revive her were unsuccessful.   In the ambulance, the paramedics noticed a fruity odor, a known symptom of untreated diabetes.  They took a blood sample to measure her blood sugar but her blood sugar level was too high for the monitor to read.  Reports from emergency medical personnel and doctors indicated that Kara appeared extremely skinny and malnourished, with a bluish-gray skin color, and was dehydrated and skeleton-like, with a pronounced pelvic bone, eye sockets, cheekbones, and ribs.

¶28  According to the emergency room doctor's testimony, Kara was "cachetic", which is a term normally used to describe a cancer patient——very malnourished, thin, and smaller than you expect of the age.  The emergency room doctor diagnosed Kara's

11

cause of death as diabetic ketoacidosis, which was later confirmed by the medical examiner's autopsy.

¶29 The emergency room doctor also testified that if a child is brought into the emergency room suffering from diabetic ketoacidosis but is still breathing and still has a heartbeat, the prognosis for survival is very good.  A pediatric endocrinologist testified that, if treated, diabetic ketoacidosis has a 99.8% survival rate.  He testified that Kara's disease was treatable and her chances of survival were high until "well into the day of her death."

¶30 Each parent was charged with, and convicted of, second-degree reckless homicide in connection with Kara's death.  Each was sentenced to 180 days in jail and ten years of probation.  Each was sentenced to serve 30 days in jail each year for six years, alternating the months of March and September with the other parent.  The circuit court granted a motion to stay the jail sentence pending this appeal.

II

¶31 The parents argue that their convictions for choosing treatment through prayer violate due process fair notice requirements.  In Part A., we first explain the constitutional due process fair notice requirement.  In Part B., we then set forth the four statutes at issue, Wis. Stat. §§ 940.06(1), 948.03(3)(a), 948.03(3)(c), and 948.03(6).  Next, in Part C., we lay out the parties' challenge to the constitutionality of the statutes.  Finally, in Part D., we conclude that the statutes fulfill the constitutional due process fair notice requirement.

12

A

¶32 The Fourteenth Amendment of the United States Constitution assures that no person shall be deprived of "life, liberty, or property without due process of law."[10] Whether state action constitutes a violation of due process presents a question of law, which this court decides independently of the circuit court but benefiting from its analysis.[11]

¶33 The due process issue in the instant case, as we explained previously, is whether the applicable statutes are definite enough to provide a standard of conduct for those whose activities are proscribed.[12] Fair notice is part of the due process doctrine of vagueness. "[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law."[13]

---

[10] Article I, Section 1 of the Wisconsin Constitution has been interpreted as a due process provision. Reginald D. v. State, 193 Wis. 2d 299, 306-07, 533 N.W.2d 181 (1995).

[11] State v. Sorenson, 2002 WI 78, ¶25, 254 Wis. 2d 54, 646 N.W.2d 354.

[12] Kolender v. Lawson, 461 U.S. 352, 357-58 (1983); Grayned v. City of Rockford, 409 U.S. 104, 108 (1972); Elections Bd. v. Wis. Mfrs. & Commerce, 227 Wis. 2d 650, 676-77, 597 N.W.2d 721 (1999); State v. Nelson, 2006 WI App 124, ¶36, 294 Wis. 2d 578, 718 N.W.2d 168.

[13] Connally v. Gen. Constr. Co., 269 U.S. 385, 391 (1926).

¶34 A challenged statute "need not define with absolute clarity and precision what is and is not unlawful conduct."[14] "A certain amount of vagueness and indefiniteness is inherent in all language and, if not permitted, nearly all penal statutes would be void."[15] "A fair degree of definiteness is all that is required."[16]

¶35 Justice Holmes observed, "[T]he law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree."[17] The Justice wisely wrote that statutes cannot be exactly precise in drawing lines:

> Wherever the law draws a line there will be cases very near each other on opposite sides. The precise course of the line may be uncertain, but no one can come near it without knowing that he does so, if he thinks, and if he does so, it is familiar to the criminal law to make him take the risk.[18]

¶36 The United States Supreme Court has explained that the degree of vagueness that the Constitution tolerates and the relative importance of fair notice and fair enforcement depend

---

[14] State v. Pittman, 174 Wis. 2d 255, 276-77, 496 N.W.2d 74 (1993) (quoting State v. Hurd, 135 Wis. 2d 266, 272, 400 N.W.2d 42 (Ct. App. 1986)).

[15] State v. Ehlenfeldt, 94 Wis. 2d 347, 355, 288 N.W.2d 786 (1980).

[16] State v. Courtney, 74 Wis. 2d 705, 710, 247 N.W.2d 714 (1976) (quoted source omitted).

[17] Nash v. United States, 229 U.S. 373, 377 (1913).

[18] United States v. Wurzbach, 280 U.S. 396, 399 (1930).

14

in part on the nature of the enactment.[19]  Enactments with civil rather than criminal penalties are often granted greater tolerance because the consequences of imprecision are qualitatively less severe.[20]

¶37 Relevant to our inquiry in the present case, the Court has recognized that a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the actor that his or her conduct is prohibited.[21]  A scienter requirement may mitigate a criminal law's vagueness by ensuring that it punishes only those who are aware their conduct is unlawful.[22]  Nevertheless, "criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed."[23]

B

---

[19] *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1962).

[20] *Id.* (citing *Barenblatt v. United States*, 360 U.S. 109, 137 (1959) (Black, J., dissenting, joined by Warren, C.J., & Douglas, J.); *Winters v. New York*, 333 U.S. 507, 515 (1948)).

[21] *Hoffman Estates*, 455 U.S. at 499 (citing *Colautti v. Franklin*, 439 U.S. 379, 395 (1979); *Boyce Motor Lines v. United States*, 342 U.S. 337, 342 (1952); *Screws v. United States*, 325 U.S. 91, 101-103 (1945) (plurality opinion); Note, *The Void-for-Vagueness Doctrine in the Supreme Court*, 109 U. Pa. L. Rev. 67, 87 n.98 (1960)).

[22] *United States v. Gaudreau*, 860 F.2d 357, 360 (10th Cir. 1988) (citing *Screws*, 325 U.S. at 101-04 (plurality opinion)).

[23] *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32-33 (1963).

¶38    In considering whether the criminal statutes at issue satisfy the requirements of due process fair notice, we begin by setting forth the texts of the statutes involved.

¶39    The parents were convicted of violating Wis. Stat. § 940.06(1), the second-degree reckless homicide statute. This statute is a single sentence that governs all persons, not only parents, and provides as follows:

> Sec.    940.06(1)    Second-degree    reckless    homicide. Whoever <u>recklessly</u> causes the death of another human being is guilty of a Class D Felony (emphasis added).

¶40    "Recklessly" is defined in Wis. Stat. § 939.24(1) to mean

> that the actor creates an unreasonable and substantial risk of death or <u>great bodily harm</u> to another human being and the actor is aware of that risk . . . (emphasis added).

¶41    "Great bodily harm" is defined in Wis. Stat. § 939.22(14) as "bodily injury which creates a substantial risk of death, or" other enumerated physical injuries.

¶42    We now turn to Wis. Stat. § 948.03, the criminal child abuse statute.

¶43    The text of the criminal child abuse statute, Wis. Stat. § 948.03(1), (3)(a), and (3)(c), reads as follows:

> (1)    Definitions.    In this section, "recklessly" means conduct which creates a situation of unreasonable risk of harm to and demonstrates a conscious disregard for the safety of the child.
>
> . . . .
>
> (3)    Reckless causation of bodily harm.

16

(a) Whoever recklessly causes <u>great bodily harm</u> to a child is guilty of a Class E Felony.

. . . .

(c) Whoever recklessly causes bodily harm[24] to a child by conduct which creates a high probability of <u>great bodily harm</u> is guilty of a Class H Felony (emphasis and footnote added).

¶44    The last statute at issue is Wis. Stat. § 948.03(6), a provision in the criminal child abuse statute that protects persons who engage in treatment through prayer from prosecution for criminal child abuse under Wis. Stat. § 948.03.    Wisconsin Stat. § 948.03(6) provides as follows:

948.03(6) Treatment through prayer.    A person is not guilty of an offense under this section [§ 948.03] solely because he or she provides a child with treatment by spiritual means through prayer alone for healing in accordance with the religious method of healing permitted under s. 48.981(3)(c)4.[25]    or 448.03(6)[26] in lieu of medical or surgical treatment. (Footnotes added.)

_____

[24] "'Bodily harm' means physical pain or injury, illness, or any impairment of physical condition."    Wis. Stat. § 939.22(4).

[25] The legislature limited this exception to religious healing methods permitted in Wis. Stat. § 48.981(3)(c)4., which provides that the government's "determination that abuse or neglect has occurred may not be based solely on the fact that that the child's parent . . . in good faith selects and relies on prayer or other religious means for treatment of disease or for remedial care of the child."

[26] This provision refers specifically to the practice of Christian Science.    The parents are not practitioners of this religion.

17

¶45 Section 948.03(6) was enacted in 1987 at the behest of the Christian Science Committee on Publication in Wisconsin.[27] Provisions protecting persons who resort to treatment through prayer from prosecution for child abuse had previously been adopted in the 1970s by numerous states, including Wisconsin, at the behest of the federal government.[28]

---

[27] See Letters from George E. Jeffrey, Christian Science Committee on Publication for Wisconsin, to Assemblyman John D. Medinger, Wis. State Assembly (Feb. 27, 1987) & Senator Brian D. Rude, Wis. State Senate (July 15, 1987) (suggesting language very similar to the current Wis. Stat. § 948.03(6) be included in an amendment to Senate Bill 203 relating to the abuse of children); Memorandum from Laurie E. Smith, Legislative Assistant to Senator Brian D. Rude, Wis. State Senate, to Bruce Feustal, Senior Attorney, Legislative Reference Bureau (July 22, 1987) (requesting an amendment to Senate Bill 203 "which uses the language included in Mr. Jeffrey's letter") (Drafting File, 1987 Act 332, Legislative Reference Bureau, Madison, Wis.).

[28] The protection of persons who resort to treatment through prayer, Wis. Stat. § 48.981(3)(c)3., was adopted in 1977. § 4, ch. 355, Laws of 1977. Many states, including Wisconsin, complied with the 1974 federal Child Abuse Prevention and Treatment Act (CAPTA), which in part required states to amend their child abuse and neglect statutes to include an exemption for spiritual healing. If a state failed to amend its statutes to include such an exemption, it would be ineligible to receive the funds appropriated by Congress to fulfill various objectives, including establishing preventative programs to reduce the incidence of child abuse.

A counter-campaign urging repeal of such statutory exemptions ensued, and Congress revised the law in 1983, revoking the requirement that states enact these treatment-through-prayer provisions in order to receive federal funding. Still, the laws have remained on the books in many states.

¶46 In order to compare the four statutes more easily, we insert the defined terms into the text of each statute and reprint the four statutes below:

> Wis. Stat. § 940.06(1) Whoever creates an unreasonable and substantial risk of death or bodily injury which creates a substantial risk of death, or other enumerated physical injuries, to another human being and is aware of that risk and causes the death of another human being is guilty of a Class D Felony.

> Wis. Stat. § 948.03(3)(a) Whoever creates a situation of unreasonable risk of harm to and demonstrates a conscious disregard for the safety of the child and causes bodily injury which creates a substantial risk of death, or other enumerated physical injuries, to a child is guilty of a Class E Felony.

> Wis. Stat. § 948.03(3)(c) Whoever creates a situation of unreasonable risk of harm to and demonstrates a conscious disregard for the safety of a child and causes bodily harm to a child by conduct which creates a high probability of bodily injury which creates a substantial risk of death, or other enumerated physical injuries, is guilty of a Class H Felony.

> Wis. Stat. § 948.03(6) Treatment through prayer. A person is not guilty of an offense under this section [§ 948.03] solely because he or she provides a child with treatment by spiritual means through prayer alone for healing in accordance with the religious method of healing permitted under s. 48.981(3)(c)4. or 448.03(6) in lieu of medical or surgical treatment.

---

For discussions of the federal law and the responses of the states, see, e.g., Janna C. Merrick, Spiritual Healing, Sick Kids and the Law: Inequities in the American Healthcare System, 29 Am. J.L. & Med. 269, 277-80 (2003); Paula A. Monopoli, Allocating the Costs of Parental Free Exercise: Striking a New Balance Between Sincere Religious Belief and a Child's Right to Medical Treatment, 18 Pepp. L. Rev. 319, 330-34 (1991); Rebecca Williams, Note, Faith Healing Exceptions Versus Parens Patriae: Something's Gotta Give, 10 First Amend. L. Rev. 692, 694-96, 698-713 (2012).

C

¶47 We now set forth the parties' due process fair notice challenge.

¶48 The parents do not assert that Wis. Stat. § 948.03(6), the treatment-through-prayer provision, applies in and of itself to the second-degree reckless homicide statute. Such an argument would fly in the face of the text of Wis. Stat. § 948.03(6).

¶49 The text of the treatment-through-prayer provision carefully limits its application only to charges under the criminal child abuse statute, that is, to child abuse prosecutions under Wis. Stat. § 948.03. The treatment-through-prayer provision explicitly states it applies only to "an offense under this section."

¶50 This treatment-through-prayer provision by its very terms thus applies only to charges of criminal child abuse under Wis. Stat. § 948.03. On its face, the treatment-through-prayer provision does not immunize a parent from any criminal liability other than that created by the criminal child abuse statute. There is no cross-reference between the criminal child abuse statute and the second-degree reckless homicide statute. No one reading the treatment-through-prayer provision should expect protection from criminal liability under any other statute.[29]

---

[29] The parents do not claim that they read and relied on the statutes before treating Kara with prayer. Indeed the unstated premise of the parents' arguments is that the parents' actual knowledge of the statutes before Kara's death is irrelevant.

¶51 Furthermore, Wis. Stat. § 948.03(6), the provision protecting parents for treatment through prayer, is written in narrow language. It includes the limiting word "solely." "A person is not guilty of an offense under this section [§ 948.03] solely because he or she provides a child with treatment by spiritual means through prayer alone . . . ." The word "solely" has not been interpreted in Wisconsin in this context, but other jurisdictions have interpreted similar provisions as signifying that treatment through prayer does not create blanket protection from criminal prosecution for child abuse for a parent who treats his or her child with prayer.[30]

---

The accepted legal fiction is that every person is expected to know the law. Ignorance of the law is not ordinarily a defense. Putnam v. Time Warner Cable of S.E. Wis., 2002 WI 108, ¶13 n.4, 255 Wis. 2d 447, 649 N.W.2d 626 (Wisconsin employs the mistake of law doctrine which says that every person is presumed to know the law and cannot claim ignorance of it as a defense); Byrne v. State, 12 Wis. 519 (1860) ("[D]efendants are presumed to know the law, and ignorance of the law, even if proved, would be no excuse").

Actual notice of the statutes may be irrelevant in applying the concept of fair notice. Courts require the law be clear so that those who consult the law are not confused or misled. Justice Holmes observed that "[a]lthough it is not likely that a criminal will carefully consider the text of the law before he murders or steals, it is reasonable that a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed." McBoyle v. United States, 283 U.S. 25, 27 (1931).

[30] The word "solely" has been interpreted to signify that treatment through prayer is not necessarily an absolute defense for the crime in which the treatment-through-prayer protection applies. One interpretation of "solely" is that the severity of the child's illness may render the protection inapplicable. Commonwealth v. Twitchell, 617 N.E.2d 609, 612 n.4 (Mass. 1993).

The Supreme Court of Colorado explained the language "for that reason alone" in its statute as follows:

> [T]he meaning of the statutory language, "for that reason alone," is quite clear.  It allows a finding of dependency and neglect for other "reasons," such as where the child's life is in imminent danger, despite any treatment by spiritual means.  In other words, a child who is treated solely by spiritual means is not, for that reason alone, dependent or neglected, but if there is an additional reason, such as where the child is deprived of medical care necessary to prevent a life-endangering condition, the child may be adjudicated dependent and neglected under the statutory scheme.

In re D.L.E., 645 P.2d 271, 274-75 (Colo. 1982).  See also Walker v. Superior Court, 47 Cal. 3d 112, 131 (1988) (citing the Colorado decision with approval).

22

¶52 Provisions regarding treatment through prayer appear in several instances in the Wisconsin statutes.[31] Taken together, these statutes evidence the legislature's balancing in each instance of the interests of persons who rely on treatment through prayer and the State's interest in protecting individuals. The statutes demonstrate that the legislature has carefully considered under what circumstances it is willing to allow reliance on treatment through prayer for those who believe in the efficacy of such treatment and when it is not. If the legislature intended a treatment-through-prayer provision to apply across the board to all criminal statutes, the legislature

---

[31] See, e.g., Wis. Stat. § 46.90(7) (nothing in § 46.90 creating an elder abuse reporting system "may be construed to mean that a person is abused, financially exploited, neglected or in need of direct or protective services solely because he or she consistently relies upon treatment by spiritual means through prayer for healing in lieu of medical care in accordance with his or her religious tradition"); Wis. Stat. § 48.82(4) (no person shall be denied adoption because of religious belief in the use of spiritual means through prayer for healing); Wis. Stat. § 102.42(6) ("Unless the employee shall have elected Christian Science treatment in lieu of medical . . . treatment no [workers] compensation shall be payable for the death or disability of an employee, if the death be caused or insofar as the disability may be aggravated . . . by an unreasonable refusal or neglect to submit to or follow any competent and reasonable medical . . . treatment . . . ."); Wis. Stat. § 938.505(2)(a)1. (a court "may not determine that a parent's or guardian's consent [to the administration of psychotropic medication to a juvenile under the supervision of the Department of Corrections] is unreasonably withheld solely because the parent or guardian relies on treatment by spiritual means through prayer for healing in accordance with his or her religious tradition"); Wis. Stat. § 940.285(1m) (excepts treatment through prayer from criminal prosecution for abuse of "at-risk" individuals).

could have used different language or placed a treatment-through-prayer provision in Chapter 939 with other defenses to criminal liability.[32]

¶53 Thus, the text of the treatment-through prayer-provision, Wis. Stat. § 948.03(6), does not and cannot lead parents to expect that they are immune from criminal prosecution for second-degree reckless homicide.[33]

---

[32] See Wis. Stat. ch. 939, subchapter III, Defenses to Criminal Liability (Wis. Stat. §§ 939.42-.49).

[33] In 1993, two bills were introduced in the Wisconsin Senate, one repealing and the other extending treatment-through-prayer provisions. 1993 Senate Bill 107 attempted to eliminate the prayer treatment protection provisions by repealing Wis. Stat. § 948.03(6) and striking the related text in Wis. Stat. § 48.981(3)(c)4. 1993 Senate Bill 544 attempted to extend coverage to provide a treatment-through-prayer exception for crimes involving criminal negligence and criminal recklessness. Both of those bills failed to pass.

The Analysis by the Legislative Reference Bureau regarding 1993 Senate Bill 544 explains, as follows, that the second-degree reckless homicide statute does not except treatment through prayer:

> Current law provides a treatment through prayer exception to the crime of physical abuse of a child. A person is not guilty of physical abuse of a child because the person relies on treatment of the child through prayer for healing. This bill extends this coverage to provide a treatment through prayer exception for crimes involving criminal negligence or criminal recklessness.

Drafting File for 1993 S.B. 544, Legislative Reference Bureau, Madison, Wis.

¶54 Rather than rely on the statutory treatment-through-prayer provision as explicitly protecting them from prosecution under the second-degree reckless homicide statute, the parents assert that the interplay of Wis. Stat. § 940.06(1), the second-degree reckless homicide statute, and § 948.03, the criminal child abuse statute (including the treatment-through-prayer provision), creates a lack of "fair notice" of prohibited conduct.

¶55 The parents' fair notice argument turns on the phrase "great bodily harm," which appears in the three statutory provisions at issue: Wis. Stat. §§ 940.06(1), 948.03(3)(a), and 948.03(3)(c).  "Great bodily harm" means bodily injury that creates a substantial risk of death or other enumerated physical injuries.  Wis. Stat. § 939.22(14).

¶56 The parents contend that there is no legal difference between the conduct governed by the three statutes:  "This 'substantial risk of death' that creates criminal liability under reckless homicide is the same 'substantial risk of death' explicitly protected in the prayer treatment exception."[34]  Even if there is a line between the statutes in theory, the parents aver that the line is too difficult to define or conceptualize.

_____

Although 1993 S.B. 544 was never enacted, its introduction tends to show that the legislators who introduced it, and the Christian Science Committee on Publication that suggested it, did not believe that the treatment-through-prayer provision in the criminal child abuse statute provided protection from prosecution for crimes involving criminal recklessness.

[34] Brief and Appendix of Defendant-Appellant Leilani E. Neumann at 12.

25

¶57 Accordingly, the parents maintain that a prayer-treating parent is protected up to and including the point at which the child experiences great bodily injury that means, among other things, a substantial risk of death. The parents read Wis. Stat. § 948.03(6) as telling prayer-healing parents that until a child's medical condition progresses "to at least some point beyond a 'substantial risk of death,' they are immune from prosecution."[35]

¶58 The parents interpret "the point beyond a 'substantial risk of death'" in the present cases as being the exact moment that Kara died. The parents assert that up until Kara stopped breathing, their choice of treatment through prayer was a statutorily protected response to the "substantial risk of death" that Kara was experiencing.[36] They assert that "[a]s 911

---

[35] Defendant-Appellant's Brief and Appendix (Dale R. Neumann) at 16.

[36] The parents acknowledge that they could be liable under the second-degree reckless homicide statute if death was imminent. The word "imminent" is not in the statute. The parents explain that an "imminent risk of death," is for example, respiratory failure, severe bleeding, or severe trauma. Such circumstances, they concede, would arguably lie beyond a substantial risk of death and would give clear notice to a parent that immunity under Wis. Stat. § 948.03(6) no longer applies.

According to the parents, Kara's condition had not progressed beyond "a substantial risk of death" and did not involve "imminent" death. The parents contend the imminence of death did not occur in the present case until Kara stopped breathing.

26

was called as soon as Kara stopped breathing," the "line" protecting prayer-treating parents "was never crossed."[37]

¶59 The parents assert there is no boundary, no clear moment when they were on notice that their failure to provide medical care had crossed the line between the protection offered under Wis. Stat. § 948.03(6) and liability under Wis. Stat. § 940.06(1).   The parents argue that the only dividing line between legality and illegality of the parents' conduct is the happenstance of death, and that this dividing line is too vague and unclear to provide sufficient notice in the present case.

¶60 Using this reasoning, the parents conclude that due process fair notice has been violated because they were convicted for conduct that the State told them was protected.[38] They allege that the conflicting legal provisions violate due process by failing to furnish fair notice of what conduct is illegal.[39]

¶61 Both the State and parents cite case law from other states that have addressed a due process fair notice challenge to support their respective positions.   Most cases lend support

---

[37] Defendant-Appellant's Brief and Appendix (Dale R. Neumann) at 16 n.5; see also Brief and Appendix of Defendant-Appellant Leilani E. Neumann at 14.

[38] See, e.g., Cox v. Louisiana, 379 U.S. 559, 571 (1965); United States v. Cardiff, 344 U.S. 174, 176-77 (1952); Raley v. Ohio, 360 U.S. 423, 438-39 (1959).

[39] Cardiff, 344 U.S. at 176-77.

to the State's position.[40] A minority of cases lends support to the parents' position.[41] The parents distinguish the cases

---

[40] See, e.g., Walker v. Superior Court of Sacramento County, 763 P.2d 852, 873 (Cal. 1988) (The Supreme Court of California held that a prayer treatment exemption did not provide a defense to prosecution for involuntary manslaughter; the statutes there provided sufficient notice that "the provision of prayer alone . . . would be accommodated only insofar as the child was not threatened with serious physical harm or illness." This aspect of the Walker case may have been overturned by a federal district court; see Walker v. Keldgord, No. CIV S-93-0616 LKK JFM P (E.D. Cal. 1996)); Hall v. State, 493 N.E.2d 433 (Ind. 1986) (The trial court's finding that the parents acted recklessly in failing to seek medical care for their sick child was sufficiently supported by the evidence. Reckless homicide does not have a statutory defense excusing responsibility for a death that resulted from what our legal system has defined to be reckless acts, regardless of whether these acts were conducted pursuant to religious beliefs. The legislature had distinguished between child neglect that results in serious bodily injury and child neglect that results in the child's death. Prayer is not permitted as a defense when a caretaker engages in omissive conduct that results in the child's death.); Commonwealth v. Twitchell, 617 N.E.2d 609 (Mass. 1993) (Parents have a duty to seek medical attention for a seriously ill child. Wanton or reckless conduct could support a conviction of involuntary manslaughter. The spiritual healing provision did not bar prosecution for manslaughter in those circumstances.); State v. Hays, 964 P.2d 1042, 1046 (Or. Ct. App. 1998) (The statutes permit a parent to treat a child by prayer or other spiritual means so long as the illness is not life-threatening. Once a reasonable person should know that there is a substantial risk that the child will die without medical care, the parent must provide that care, or allow it to be provided, at the risk of criminal sanctions if the child dies. It may be impossible to define in advance all the ways in which a person's actions can be a gross deviation from the standard of care of a reasonable person, and thus criminally negligent under Oregon law; "[t]hat difficulty does not mean, however, that the legislature may not penalize such a gross deviation."); Commonwealth v. Nixon, 718 A.2d 311, 313 (Pa. 1998) (A plain reading of the statutes shows that an act that does not qualify as child abuse may still be done in a manner that causes death and thus qualifies as involuntary manslaughter. The Nixons were not considered child abusers for treating their children through

28

favoring the State's position, and the State distinguishes the cases favoring the parents' position, each noting the differences in the statutes of other states and in the facts of the cases.    The laws and facts are different in these non-Wisconsin cases, but the discussions and applications of the due process fair notice requirements by other state courts have been helpful in our analysis.

D

---

spiritual healing, but when their otherwise lawful course of conduct led to a child's death, they were guilty of involuntary manslaughter.).

For a discussion of these cases, see articles cited at note 28, supra, and note 59, infra.  See also Jennifer L. Rosato, Putting Square Pegs in a Round Hole:  Procedural Due Process and the Effect of Faith Healing Exemptions on the Prosecution of Faith Healing Parents, 29 U.S.F. L. Rev. 43, 103-16 (1994).

[41] Hermanson v. State, 604 So. 2d 775, 782 (Fla. 1992) (When considered together, the spiritual treatment accommodation provision and child abuse statutes failed to give parents notice of the point at which their reliance on spiritual treatment lost statutory approval and became culpably negligent.  The statutory scheme in place failed to establish a line of demarcation at which a person could know his conduct was criminal.); State v. McKown, 475 N.W.2d 63, 68-69 (Minn. 1991) (The manslaughter statute failed to give the prayer-treating parents fair notice of the prohibited conduct. "[W]here the state had clearly expressed its intention to permit good faith reliance on spiritual treatment and prayer as an alternative to conventional medical treatment, it cannot prosecute respondents for doing so without violating their rights to due process.").

See Baruch Gitlin, Parents' Criminal Liability for Failure to Provide Medical Attention to Their Children, 118 A.L.R. 5th 253 (2004) (made current by weekly addition of released cases) (collecting cases including cases on the spiritual treatment defense).

¶62 Having set forth the parents' constitutional challenge, we now determine the constitutionality of the statutes.  Interpreting and applying a statute, as well as determining the constitutionality of a statute, ordinarily present a question of law that this court determines independently of the circuit court but benefiting from its analysis.[42]

¶63 The parents acknowledge, and we agree, that the protection for treatment through prayer explicitly and exclusively applies to the child abuse statute.  See ¶¶48-53, supra.

¶64 The issue we are left to consider is the parents' due process fair notice challenge based on the interplay of the four statutes and the application of the statutes to the facts of the instant cases.

¶65 The parents' challenge hinges on the fact that the texts of Wis. Stat. § 940.06(1) and § 948.03(3)(a) and (3)(c) all incorporate, in one way or another, the phrase "great bodily harm," which is defined by § 939.22(14) for all three statutes. It is apparent, however, in reading the text of the statutes, that the phrase "great bodily harm" is used in different ways in these statutes.

¶66 The second-degree reckless homicide statute, Wis. Stat. § 940.06(1), requires the State to prove the following:

---

[42] Jandre v. Wis. Injured Patients & Families Comp. Fund, 2012 WI 39, ¶60, 340 Wis. 2d 31, 813 N.W.2d 627.

- First, the reckless nature of the conduct.  The actor creates an unreasonable and substantial risk of death or great bodily harm, as defined in § 939.22(14),to another human being.

- Second, the actor's subjective mental state.  The actor was subjectively aware of the risk.

- Third, the harm caused by the actor.  The actor caused the death of another.

¶67  No one argues that the second-degree reckless homicide statute is so vaguely worded that it fails to provide fair notice of what conduct is prohibited and what conduct is protected.

¶68  For one to recklessly cause great bodily harm to a child, in violation of Wis. Stat. § 948.03(3)(a), the State must prove the following:

- First, the reckless nature of the conduct.  The actor's conduct creates a situation of unreasonable risk of harm to a child.

- Second, the actor's mental state.  The creation of the unreasonable risk of harm demonstrates a conscious disregard for a child's safety.

- Third, the harm caused by the actor.  The actor caused great bodily harm, as defined in § 939.22(14),to a child.

¶69  For one to recklessly cause bodily harm to a child, in violation of Wis. Stat. § 948.03(3)(c), the State must prove the following:

31

- First, the reckless nature of the conduct. The actor's conduct creates a situation of unreasonable risk of harm to a child and a high probability of <u>great bodily harm</u> as defined in § 939.22(14).

- Second, the actor's mental state. The creation of the unreasonable risk of harm demonstrates a conscious disregard for a child's safety.

- Third, the harm caused by the actor. The actor caused bodily harm to a child.

¶70 No one argues that Wis. Stat. § 948.03(3)(a) and (3)(c) of the criminal child abuse statute are so vaguely worded that they fail to provide fair notice of what conduct is prohibited.

¶71 It is evident that the parents' failure to provide medical care is the conduct penalized in each of the three statutes. It is also evident that although the three statutes incorporate the same phrase, "great bodily harm," they do so in different ways. The second-degree reckless homicide statute differs from Wis. Stat. § 948.03(3)(a) and (3)(c) of the criminal child abuse statute in three important respects: the reckless nature of the conduct governed, the mental state required, and the harm caused by the actor.

¶72 The second-degree reckless homicide statute, Wis. Stat. § 940.06(1), governs reckless conduct, that is, conduct that creates an unreasonable and substantial risk of death or great bodily harm to another. Wisconsin Stat. § 948.03(3)(a) governs reckless conduct, that is, conduct that creates a

32

situation of unreasonable risk of harm to a child. Wisconsin Stat. § 948.03(3)(c) governs reckless conduct, that is, conduct that creates a situation of unreasonable risk of harm to a child that creates a high probability of great bodily harm.

¶73 Perhaps most important for this discussion of due process fair notice is the different mens rea in the statutes at issue. The word "recklessly" is defined differently in the second-degree reckless homicide statute (Wis. Stat. § 939.24(1)) and in the criminal child abuse statute (§ 948.03(1)), resulting in requiring different mens rea.

¶74 As the Judicial Council Note to Wis. Stat. § 939.24 explains, the second-degree reckless homicide statute requires "both the creation of an objectively unreasonable and substantial risk of human death or great bodily harm and the actor's subjective awareness of that risk."[43] This is the only statute at issue that requires the State to prove that an actor has a subjective mens rea, that is, the actor is subjectively aware of the risk he or she creates.

¶75 The criminal child abuse statute, Wis. Stat. § 948.03, has no subjective mens rea component.

¶76 The court of appeals explained the difference between the mental states in Wis. Stat. § 940.06(1) and § 948.03(3)(a)

---

[43] Judicial Council Note, 1988, Wis. Stat. § 939.24.

"[R]ecklessness requires a subjective mental state: the defendant must actually (in her own mind) be aware of the risk created by the conduct." Walter Dickey et al., The Importance of Clarity in the Law of Homicide: The Wisconsin Revision, 1989 Wis. L. Rev. 1323, 1352.

and (3)(c) in State v. Williams, 2006 WI App 212, ¶26, 296 Wis. 2d 834, 723 N.W.2d 719, as follows:

> [R]eckless child abuse requires the defendant's actions demonstrate a conscious disregard for the safety of a child, not that the defendant was subjectively aware of that risk.  In contrast, "criminal recklessness" is defined as when "the actor creates an unreasonable and substantial risk of death or great bodily harm to another human being and the actor is aware of that risk."  Thus, "recklessly" causing harm to a child under § 948.03(b) is distinguished from "criminal recklessness," because only the latter includes a subjective component.  We therefore conclude that recklessly causing harm to a child, unlike criminal recklessness, does not contain a subjective component (citations omitted).

¶77 A subjective scienter requirement, as we explained previously, can alleviate vagueness because an actor who knows what he or she is doing and is aware of the unlawful risk cannot be heard to claim that he or she did not know his or her conduct was prohibited.[44]

¶78 The final distinction between the statutes at issue is the harm caused by the actor's conduct.  Under Wis. Stat. § 940.06(1), the State must prove that the actor caused the death of another.  In contrast, under the child abuse statutes the State must prove that the actor caused great bodily harm

---

[44] Hoffman Estates, 455 U.S. at 499 (citing Colautti v. Franklin, 439 U.S. 379, 395 (1979); Boyce Motor Lines v. United States, 342 U.S. 337, 342 (1952); Screws, 325 U.S. at 101-03 (plurality opinion); Note, The Void-for-Vagueness Doctrine in the Supreme Court, 109 U. Pa. L. Rev. 67, 87, n.98 (1960)).  See also United States v. Gaudreau, 860 F.2d 357, 360 (10th Cir. 1988) (citing Screws, 325 U.S. at 101-04 (plurality opinion)).

under Wis. Stat. § 948.03(3)(a) or bodily harm under Wis. Stat. § 948.03(3)(c).[45]

¶79 If we were to accept the parents' interpretation and application of the four statutes to the facts of the present cases, all prayer-treating parents would in effect be immunized from second-degree reckless homicide. If we were to adopt the parents' reasoning, no prayer-treating parent would know what point is beyond "a substantial risk of death" until the child actually stopped breathing and died.

¶80 Each statute must be read in its entirety and in combination with the other statutes. The phrase "great bodily harm" cannot be disembodied from the entire text of each statute and considered in isolation to render the statutes violative of due process. The parents' emphasis on the phrase "great bodily harm" ignores the distinction in the reckless nature of the conduct, the mental state, and the harm in the criminal child abuse and second-degree reckless homicide statutes. Each statute read as a whole, and in combination with the other statutes at issue, gives actors (including the parents in the instant case) fair notice of when the actor may be held liable or may be protected under the statutes.

---

[45] The different legislative treatment of criminal conduct on the basis of whether death results is not unique to these statutes. Criminal charges are inevitably reliant on the result of the actor's conduct. An actor cannot be guilty of any homicide unless the victim dies. If the victim lives despite the actor's conduct, the actor is not guilty of homicide but may be guilty of attempted homicide or some other crime.

35

¶81 We conclude that the second-degree reckless homicide statute and the criminal child abuse statute are sufficiently distinct that a parent has fair notice of conduct that is protected and conduct that is unprotected. The statutes are definite enough to provide a standard of conduct for those whose activities are proscribed and those whose conduct is protected.[46] A reader of the treatment-through-prayer provision cannot reasonably conclude that he or she can, with impunity, use prayer treatment as protection against all criminal charges. The four statutes are not unconstitutional on due process fair notice grounds.

¶82 In sum, when a parent fails to provide medical care to his or her child, creates an unreasonable and substantial risk of death or great bodily harm, is aware of that risk, and causes the death of the child, the parent is guilty of second-degree reckless homicide.[47]

---

[46] Kolender v. Lawson, 461 U.S. 352, 357-58 (1983); Grayned v. City of Rockford, 409 U.S. 104, 108 (1972); Elections Bd. v. Wisconsin Mfrs. & Commerce, 227 Wis. 2d 650, 676-77, 597 N.W.2d 721 (1999); State v. Nelson, 2006 WI App 124, ¶36, 294 Wis. 2d 578, 718 N.W.2d 168.

[47] The dissent raises a concern about whether a parental duty will arise in cases when a parent is confronted with similar symptoms that do not arise from diabetic ketoacidosis. Dissent, ¶188. The parents in this case knew that Kara was severely ill but did not specifically know that she was suffering from diabetic ketoacidosis. The ultimate, underlying diagnosis is of little consequence to the analysis. Rather, in applying the statute's conduct and mens rea components, the focus is on the severity of the symptoms displayed, the parents' awareness of the severity of the symptoms, and the parents' subsequent failure to seek medical care.

¶83 This crime is substantially different from the crimes punished under the criminal child abuse statute. When a parent fails to provide medical care when there is a duty to act, creates a situation of unreasonable risk of harm to and demonstrates a conscious disregard for the safety of the child, and causes great bodily harm, the parent is guilty of violating Wis. Stat. § 948.03(3)(a).

¶84 When a parent fails to provide medical care when there is a duty to act, creates a situation of unreasonable risk of harm to and demonstrates a conscious disregard for the safety of the child, and causes bodily harm to a child by conduct that creates a high probability of great bodily harm, the parent is guilty of violating Wis. Stat. § 948.03(3)(c).

¶85 A parent is not guilty of violating Wis. Stat. § 948.03(3)(a) and (3)(c) "solely because he or she provides a child with treatment by spiritual means through prayer alone for healing in accordance with the religious method of healing permitted under s. 48.981(3)(c)4. or 448.03(6) in lieu of medical or surgical treatment." Wis. Stat. § 948.03(6).

¶86 The juries could reasonably find that by failing to call for medical assistance when Kara was seriously ill and in a coma-like condition for 12 to 14 hours, the parents were creating an unreasonable and substantial risk of Kara's death, were subjectively aware of that risk, and caused her death. On the record before it, each jury could reasonably find that the State proved the elements of second-degree reckless homicide under Wis. Stat. § 940.06(1).

37

III

¶87 The parents assert that their convictions should be reversed and new trials should be ordered in the interest of justice under Wis. Stat. § 751.06.  They maintain that the real controversy was not fully tried because of erroneous jury instructions and ineffective assistance of counsel.  If this court determines that the real controversy has not been fully tried, it may, in the exercise of its sound discretion, enter such order as is necessary to accomplish the ends of justice.[48]

¶88 The real controversy, according to the parents, is whether the parents' sincere belief in prayer treatment negated the subjective element of second-degree reckless homicide.  This affirmative defense was not fully tried, they contend, because the circuit court gave an erroneous jury instruction about a parent's legal duty to care for a child and an erroneous jury instruction about religious beliefs, and the circuit court did not instruct the jury about the effect of a sincere religious belief.

¶89 A circuit court has broad discretion in issuing jury instructions based on the facts and circumstances of the case and in deciding whether to give a specific jury instruction requested by the parties.[49]  A circuit court must, however, "exercise its discretion in order 'to fully and fairly inform

---

[48] Wis. Stat. § 751.06.

[49] State v. Coleman, 206 Wis. 2d 199, 212, 556 N.W.2d 701 (1996) (quoted source omitted); State v. Vick, 104 Wis. 2d 678, 690, 312 N.W.2d 489 (1981).

the jury of the rules of law applicable to the case and to assist the jury in making a reasonable analysis of the evidence.'"[50] When jury instructions are challenged as not correctly informing the jury of the law applicable to the charge, as they are in the present case, the challenger has presented a question of law that an appellate court determines independently of the circuit court but benefiting from its analysis.[51]

¶90 The following jury instructions were given in the father's trial regarding the elements of the crime. The instructions follow Wis JI——Criminal 1060. The instructions about a parent's legal duty to protect the child and religious belief are not part of Criminal Jury Instruction 1060.

> Second degree reckless homicide, as defined in section 940.06 of the Criminal Code of Wisconsin, is committed by one who recklessly causes the death of another human being.
>
> Before you may find the defendant guilty of second-degree reckless homicide, the State must prove by

---

[50] _Coleman_, 206 Wis. 2d at 212 (internal citations omitted).

[51] _State v. Gonzalez_, 2011 WI 63, ¶22, 335 Wis. 2d 270, 802 N.W.2d 454 (Abrahamson, C.J., lead op.) (citing _State v. Ferguson_, 2009 WI 50, ¶9, 317 Wis. 2d 586, 767 N.W.2d 187).

The jury instructions are also challenged as confusing or misleading. An appellate court should order a new trial only if upon review of the instruction, the court determines that the defendant has shown that "'there is a reasonable likelihood that the jury was misled and therefore applied potentially confusing instructions in an unconstitutional manner.'" _Gonzalez_, 335 Wis. 2d 270, ¶23 (Abrahamson, C.J., lead op.) (quoting _State v. Lohmeier_, 205 Wis. 2d 183, 194, 556 N.W.2d 90 (1996)).

evidence which satisfies you beyond a reasonable doubt that the following two elements are present:

First, the defendant caused the death of Madeline Kara Neumann.  Cause means that the defendant's conduct was a substantial factor in producing the death.  Conduct can be either by an act or omission, when the defendant has a duty to act.

One such duty is the duty of a parent to protect their children, to care for them in sickness and in health.

Second, the defendant caused the death by criminally reckless conduct.  Criminally reckless conduct means the conduct created a risk of death or great bodily harm to another person.  Great bodily harm means serious bodily injury.  It is an injury which creates a substantial risk of death or serious bodily harm.

In addition, the risk of death or great bodily harm was unreasonable and substantial, and the defendant was aware that his conduct created the unreasonable and substantial risk of death or great bodily harm.

If you are satisfied beyond a reasonable doubt that the defendant caused the death of Madeline Kara Neumann by criminally reckless conduct, you should find the defendant guilty of second-degree reckless homicide.  If you are not satisfied, you must then find the defendant not guilty.

The constitutional freedom of religion is absolute as to beliefs but not as to the conduct, which may be regulated for the protection of society.

¶91  The following jury instructions regarding the elements of the crime were given in the mother's trial.  Again, the instructions follow Wis JI——Criminal 1060.  The instructions about a parent's duty to protect the child and religious belief are not part of Criminal Jury Instruction 1060.

Second-degree reckless homicide is defined in Section 940.06 of the Criminal Code of Wisconsin, and it's committed by one who recklessly causes the death of another human being.  Before you may find the

40

defendant guilty of second-degree reckless homicide, the defendant [sic] must prove by evidence which satisfies you beyond a reasonable doubt that the following two elements were present.

First, the defendant caused the death of Madeline Kara Neumann.  "Cause" means that the defendant's conduct was a substantial factor in producing the death. Conduct can be either by an act or an omission when the defendant has a duty to act.

One such duty is the duty of a parent to protect their children, to care for them in sickness and in death [sic], and to do whatever is necessary for their preservation, including medical attendance, if necessary.

Second, the defendant caused the death by criminally reckless conduct.  "Criminally reckless conduct" means the conduct created a risk of death or great bodily harm to another person.  "Great bodily harm" means serious bodily injury.  It is an injury which creates a substantial risk of death or other serious bodily injury.

In addition, the risk of death or great bodily harm was unreasonable and substantial and the defendant was aware that her condition created the unreasonable and substantial risk of death or great bodily harm.

If you are satisfied beyond a reasonable doubt that the defendant directly committed all of the two elements of second-degree reckless homicide or that the defendant intentionally aided and abetted the commission of that crime, you should find the defendant guilty.  If you are not so satisfied, then you must find the defendant not guilty.

The Constitutional Freedom of Religion is absolute as to beliefs but not as to conduct which may be regulated for the protection of society.

¶92 We shall in Part A. discuss the "duty" instruction and in Part B., the "religious belief" instruction.  We then examine in Part C. the circuit court's refusal to instruct the jury about the effect of a parent's sincere belief in prayer

41

treatment on the subjective awareness element of second-degree reckless homicide.   Finally, Part D. addresses whether counsel provided ineffective assistance.

A

¶93 The prosecutions of the parents for second-degree reckless homicide were based not on the affirmative acts of the parents that allegedly caused Kara's death but rather on the parents' omission, that is, their failure to provide Kara medical care, which allegedly caused her death.

¶94 Although the second-degree reckless homicide statute, Wis. Stat. § 940.06(1), does not include specific language criminalizing an omission, the parties agree, as do we, that an actor may be criminally liable for a failure to act if the actor has a legal duty to act.[52]

¶95 The second-degree reckless homicide statute, Wis. Stat. § 940.06(1), requires that a defendant "cause" the death of another.   An actor causes death if his or her conduct is a "substantial factor" in bringing about that result.[53]   An actor's

---

[52] State v. Williquette, 129 Wis. 2d 239, 255-56, 385 N.W.2d 145 (1986) (criminal liability based on an omission may be possible when a special relationship exists between the accused and the victim creating a legal duty to act); State ex rel. Cornellier v. Black, 144 Wis. 2d 745, 758, 425 N.W.2d 21 (Ct. App. 1988) (employer could be prosecuted for reckless homicide by omission).

See also 1 Wayne R. LaFave, Substantive Criminal Law § 6.1 at 422, § 6.2(a) at 434-437 (2d ed. 2003) (discussing a legal duty based on a relationship).

[53] State v. Oimen, 184 Wis. 2d 423, 435, 516 N.W.2d 399 (1994).

"conduct" can be an act or a failure to act (an omission).  The parents are charged with a failure to act, that is, a failure to provide medical care to Kara.

¶96  The parents argue that they did not have a legal duty to act and that the jury instructions that imposed such a legal duty were prejudicial error warranting a reversal of the convictions.[54]

¶97  Whether a parent has a legal duty to provide medical care to a child is a question of law that this court determines independently of the circuit court but benefiting from its analysis.[55]

¶98  The instruction regarding a parent's duty to provide medical care was given in the instant cases as part of the instruction explaining the causal element of the offense of second-degree reckless homicide.  The following causation instruction, as noted above, was given in the father's case:

> First, [the State must prove that] the defendant caused the death of Madeline Kara Neumann.  Cause means that the defendant's conduct was a substantial factor in producing the death.  Conduct can be either

---

[54] The parents claim, as we explained previously, that the State's theory of the case and its closing argument depend in part on the legal duty that exists when one suffers great bodily harm.  They argue that according to the jury instruction and the State's argument, guilt was proven as soon as the parents observed any symptom that met the definition of great bodily harm, thus contravening the treatment-through-prayer protection of Wis. Stat. § 948.03(6).

[55] Antwaun A. ex rel. Muwonge v. Heritage Mut. Ins. Co., 228 Wis. 2d 44, 54, 596 N.W.2d 456 (1999) (citations omitted).

by an act or omission, when the defendant has a duty to act.

One such duty is the duty of a parent to protect their children, to care for them in sickness and in health.[56]

¶99 A slightly different duty instruction, as noted above, was given in the mother's case, again as part of the instruction on the element of causation:

First, [the State must prove that] the defendant caused the death of Madeline Kara Neumann. "Cause" means that the defendant's conduct was a substantial factor in producing the death. Conduct can be either by an act or an omission when the defendant has a duty to act.

One such duty is the duty of a parent to protect their children, to care for them in sickness and in death [sic], and to do whatever is necessary for their preservation, including medical attendance, if necessary.[57]

¶100 Although the parents characterize the instructions as requiring them to provide "conventional medicine," the jury instructions do not refer to conventional medicine. The jury instructions are more general in terms of care "in sickness and in health" and "medical attendance, if necessary."

¶101 The circuit court prepared these instructions on the basis of State v. Williquette, 129 Wis. 2d 239, 255-56, 385 N.W.2d 145 (1986), which drew language from Cole v. Sears

---

[56] The father's defense counsel objected to this language.

[57] The circuit court incorrectly substituted the word "death" for the word "health." The mother's defense counsel preserved any objection to the instruction about the mother's duty.

Roebuck & Co., 47 Wis. 2d 629, 177 N.W.2d 866 (1970), a civil products liability tort case.

¶102 The parents have three objections to the duty instructions: (1) Neither Wisconsin statutes nor Wisconsin case law establishes a parent's legal duty to provide medical care to his or her child; (2) The duty instruction given violates a parent's constitutional right to direct the care of his or her child; and (3) The statutory provision protecting treatment-through-prayer (Wis. Stat. § 948.03(6)) negates any legal duty to provide medical care up to, and including, the point at which a child suffers great bodily harm, which includes a substantial risk of death.

1

¶103 We first determine whether Wisconsin law imposes a legal duty on a parent to furnish medical care to his or her child and, if so, under what circumstances.

¶104 We are not aware of any single Wisconsin statute that describes the legal duty a parent owes to a child for medical care. We are aware, however, that the statute books are replete with provisions imposing responsibility on parents for the care of their children, including the requirement that they provide

medical care when necessary.[58] These statutes demonstrate the legislature's recognition of the legal duty of parents to

---

[58] See, e.g., Wis. Stat. § 48.13(10) (the court has jurisdiction over a child whose parent, guardian, or legal custodian neglects, refuses, or is unable for reasons other than poverty to provide necessary care, food, clothing, medical or dental care, or shelter so as to seriously endanger the physical health of the child.); Wis. Stat. § 767.41(1m)(f), (g) & (i) (upon divorce, parents seeking custody of a child must file a parenting plan that prescribes which doctor will provide medical care for the child, how the child's medical expenses will be paid, and who will make the decisions about the child's medical care); Kuchenbecker v. Schultz, 151 Wis. 2d 868, 874-76 n.2, 447 N.W.2d 80 (Ct. App. 1989) (the child support statute requires that the responsibility for the child's health care be assigned to a specific parent and that there be adequate funding to fulfill the child's health care needs).

support and protect their children, including providing them with medical care, when necessary.[59]

---

[59] Other jurisdictions have also recognized a parent's legal duty to care for his or her child, including the duty to provide medical care. Some base this duty on statutes explicitly defining the duty; others base this duty on common law; and still others base this duty on numerous statutes recognizing a parent's obligations, such as child support statutes. See, e.g., Faunteroy v. United States, 413 A.2d 1394, 1299-1300 (D.C. 1980) (parents had a common law natural duty, as well as a statutory duty to provide medical care for their minor dependent children) (compiling cases from other jurisdictions); Scott County School Dist. 1 v. Asher, 324 N.E.2d 496, 499 (Ind. 1975) (a parent has a common law, and in some instances a statutory duty, to support and maintain his child, which includes the provision of necessary medical care); Craig v. State, 155 A.2d 684, 691 (Md. 1959) (Christian Science parents find themselves under the same statutory duty to provide medical care for their minor children when the circumstances require such care, as do all other parents. Treating their child in accordance with the tenets of Christian Science did not render such treatment the legal equivalent of medical care.); People v. Steinberg, 595 N.E.2d 845, 847 (N.Y. 1992) (parents "have a nondelegable affirmative duty to provide their children with adequate medical care" and thus, the failure to perform that duty can form the basis of a criminal charge); Commonwealth v. Foster, 764 A.2d 1076, 1082 (Pa. Super. Ct. 2000) ("The law imposes an affirmative duty on parents to seek medical help when the life of a child is threatened, regardless, and in fact despite, their religious beliefs."); State v. Morgan, 936 P.2d 20, 22 (Wash. Ct. App. 1997) (Washington has long recognized a natural parental duty, existing independently of the statutes, to provide medical care for minor children).

47

¶105 We turn next to the case law, which is instructive. The lead case is State v. Williquette, which discusses and recognizes a parent's legal duty to protect his or her child. Although the case does not involve the second-degree reckless homicide statute or medical care, the case is important because of its wide-ranging discussion of the parental duty owed to one's child.[60] In Williquette, a mother was prosecuted under a now-repealed statute that criminalized "subject[ing] a child to cruel maltreatment."[61] The allegation was that the mother, knowing of her husband's abuse of the children, continued to leave the children in her husband's care and did nothing to stop the abuse. The Williquette court considered the mother's leaving the children with the husband under these circumstances

_____

See also D.C. Barrett, Homicide: Failure to Provide Medical or Surgical Attention, 100 A.L.R. 2d 483 (1965) (made current by weekly addition of released cases) (collecting cases on the duty to provide medical care); Baruch Gitlin, Parents' Criminal Liability for Failure to Provide Medical Attention to their Children, 118 A.L.R. 5th 253 (2004) (made current by weekly addition of released cases) (collecting cases including cases on the spiritual treatment defense); Donna K. LeClair, Comment, Faith-Healing and Religious-Treatment Exemptions to Child-Endangerment Laws: Should Parental Religious Practices Excuse the Failure to Provide Necessary Medical Care to Children?, 13 U. Dayton L. Rev. 79 (1987).

[60] For a discussion of the Williquette case, see, e.g., State v. Rundle, 176 Wis. 2d 985, 995-999, 500 N.W.2d 916 (1993).

[61] The statute under which Williquette was prosecuted was repealed. The legislature enacted Wis. Stat. § 948.03(4) to codify the case law and create criminal liability for failing to act to prevent child abuse. See Comments——1987 Act 332, Wis. Stat. Ann. § 948.03 (West 2005).

48

to be overt conduct.[62]  Nevertheless, the court also concluded that if there were no overt act, the mother still could be convicted of the crime because "[t]he relationship between a parent and a child exemplifies a special relationship where the duty to protect is imposed."[63]

¶106 The Williquette court explained that a parent has a duty "to do whatever may be necessary for [a child's] care, maintenance, and preservation, including medical attendance, if necessary."[64]  It explained that a parent's omission to fulfill this duty is a public wrong, which the State may prevent using its police powers.[65]

¶107 The Williquette court adopted the following language from Cole as the rule of the legal duty applicable to the parent-child relationship:

> It is the right and duty of parents under the law of nature as well as the common law and the statutes of many states to protect their children, to care for them in sickness and in health, and to do whatever may be necessary for their care, maintenance, and preservation, including medical attendance, if necessary. An omission to do this is a public wrong which the state, under its police powers, may prevent. The child has the right to call upon the parent for the discharge of this duty, and public policy for the good of society will not permit or allow the parent to

---

[62] Williquette, 129 Wis. 2d at 250.

[63] Id. at 255.

[64] Id. at 255-56 (quoting Cole v. Sears Roebuck & Co., 47 Wis. 2d 629, 634, 177 N.W.2d 886 (1970)).

[65] Williquette, 129 Wis. 2d at 255-56 (quoting Cole, 47 Wis. 2d at 634).

divest himself irrevocably of his obligations in this regard or to abandon them at his mere will or pleasure. . . . 39 Am. Jur., Parent and Child, p. 669, sec. 46.[66]

¶108 The Cole court also defined the parents' duty to provide medical services and the necessities of health as follows:

> The legal obligation to provide food, clothing, housing, medical and dental services deals with the necessities of health, morals and well-being with which a child must be provided, or the parents' failure in this regard may be prevented by the state.[67]

¶109 A parent's legal duty to provide medical care to a child has been acknowledged in numerous court of appeals decisions.[68] Still, despite the longstanding case law on the subject of the legal duty of parents, Kara's parents suggest that the circuit court drew the duty instruction given in the instant case from inapposite case law. We do not agree with the parents.

¶110 The Williquette court engaged in an extensive discussion and explanation of how a parent's omission may constitute an element of a crime, even when the criminal statute is silent regarding omissions. The case established that when a

---

[66] Williquette, 129 Wis. 2d at 255-56 (quoting Cole, 47 Wis. 2d at 634).

[67] Cole v. Sears Roebuck & Co., 47 Wis. 2d 629, 634, 177 N.W.2d 866 (1970) (emphasis added).

[68] See, e.g., Gardner v. Wis. Patients Comp. Fund, 2002 WI App 85, ¶21, 252 Wis. 2d 768, 642 N.W.2d 646; Thomas C. v. Physicians Ins. Co. of Wis., 180 Wis. 2d 146, 151-52, 509 N.W.2d 81 (1993); Kuchenbecker v. Schultz, 151 Wis. 2d 868, 875-76, 447 N.W.2d 80 (1989).

special relationship exists between persons, like the relationship between a parent and a child, Wisconsin law imposes a duty on the parent to protect the child.

¶111 We therefore reaffirm the parental duty adopted in Williquette and Cole and confirm that a parent has a legal duty to provide medical care for a child if necessary.

2

¶112 We next consider the parents' alternative position that in any event the jury instructions imposing a legal duty on a parent to provide medical care for their child violate a parent's fundamental right under the United States Constitution to direct the care of his or her child.

¶113 We accept the parents' premise that the Due Process clause "protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children."[69] Nevertheless, as the United States Supreme Court explained in Prince v. Massachusetts, 321 U.S. 158 (1944), a parent's fundamental right to make decisions concerning his or her child is not unlimited:

> [T]he family itself is not beyond regulation in the public interest, as against a claim of religious liberty. And neither rights of religion nor rights of parenthood are beyond limitation. Acting to guard the general interest in youth's well being, the state as parens patriae may restrict the parent's control by requiring school attendance, regulating or prohibiting the child's labor, and in many other ways. Its authority is not nullified merely because the parent grounds his claim to control the child's course of

---

[69] Troxel v. Granville, 530 U.S. 57, 66 (2000).

51

conduct on religion or conscience.  Thus, he cannot claim freedom from compulsory vaccination for the child more than for himself on religious grounds.  The right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death.[70]

¶114 In Prince, the parents claimed their religious beliefs required their children to sell religious tracts.  They asserted a free exercise of religion claim justifying their violation of a state child labor law.  The Court concluded that a right to freely exercise one's religion did not absolve the parents from their responsibility to obey child labor laws.  The Court explained that "[t]he right to practice religion freely does not include liberty to expose the . . . child to . . . ill health or death."[71]

¶115 Justice Rutledge, writing for the Court, limited the scope of a parent's fundamental right to make decisions concerning his or her child, pointing out that in the name of religion,

[p]arents may be free to become martyrs themselves. But it does not follow they are free, in identical circumstances, to make martyrs of their children before they have reached the age of full and legal discretion when they can make that choice for themselves.[72]

---

[70] Prince v. Massachusetts, 321 U.S. 158, 166-67 (1944) (internal citations omitted).

[71] Prince, 321 U.S. at 166-67.  See also Wisconsin v. Yoder, 406 U.S. 205, 233-34 (1972).

[72] Prince, 321 U.S. at 170.

¶116 The parents' fundamental right to make decisions for their children about religion and medical care does not prevent the State from imposing criminal liability on a parent who fails to protect the child when the parent has a legal duty to act.[73]

¶117 We conclude that the jury instructions imposing a legal duty on a parent to provide medical care for his or her child when necessary do not violate a parent's fundamental constitutional right to direct the care of his or her child. "[N]either rights of religion nor rights of parenthood are beyond limitation."[74]

3

¶118 The parents' final challenge to the jury instructions echoes themes similar to the due process fair notice arguments discussed above.    According    to    the    parents,    the    jury instructions explaining that a parent has an affirmative duty to provide medical care to his or her child are legally incorrect because the protection for treatment through prayer defines a

---

[73] The parents also argue that the jury instructions regarding their legal duty to provide medical care are both unconstitutionally vague and conflict with the protection for treatment through prayer set forth in Wis. Stat. § 948.03(6).

The parents assert (without significant development) that the concepts of "protecting one's children," caring for them in sickness and in health (and death), and providing "medical attendance, if necessary," are simply too general to give sufficient guidance to either the parents or the juries. Again, we note that only a fair degree of definiteness is required. This language is sufficient when read with the other jury instructions.

[74] Prince, 321 U.S. at 166.

parent's legal duty and permits a parent to fulfill a legal duty of medical care by treating his or her child through prayer.

¶119 The parents' principal argument is that § 948.03(6) negates any general legal parental duty to provide medical care in the present cases because under Wis. Stat. § 948.03(6) they had no legal duty to provide medical care until Kara's condition progressed beyond a substantial risk of death. They assert that until Kara's condition went beyond great bodily harm, that is, until Kara's condition went beyond a substantial risk of death, that is, until Kara stopped breathing, the parents complied with their legal duty to provide medical care.

¶120 We disagree with the parents' approach. The jury instructions correctly define a parent's duty to provide medical care. The Williquette decision does not say that parents must provide medical care under any and all circumstances, even when medical care is not necessary.

¶121 Thus, we conclude that the jury instructions about a parent's legal duty to provide medical care were not in and of themselves erroneous. We discuss below the parents' contention that because the instructions on legal duty make no exception for religious beliefs or practice, the juries would have been misled to believe that a sincerely held religious belief in prayer treatment was not available to the parents as a defense to second-degree reckless homicide.

B

54

¶122 We now turn to the parents' challenge to the jury instructions regarding religious belief and government regulation of conduct.

¶123 The parents do not claim that the second-degree reckless homicide statute violates their free exercise of religion by not explicitly protecting treatment though prayer.[75] Rather, the parents claim that the religious belief instructions misled the jury about the elements the State had to prove for convictions of the charged crime of second-degree reckless homicide.

¶124 The circuit court explained that the religious belief instruction in each of the present cases "correctly describes the limits of the religious freedom by distinguishing between beliefs and actions."

¶125 We agree with the circuit court that the religious belief instructions in and of themselves are not erroneous. The United States Supreme Court has held, as the circuit court instructed, that "the constitutional freedom of religion is

---

[75] At oral argument the parents explained that they did not make this argument because they did not think it a strong argument under federal law.  The mother noted that the circuit court's failure to give a sincere belief instruction makes it likely that the jury will assess the objective reasonableness of prayer treatment and encourages the violation of First Amendment rights.  The First Amendment, the parents argue, prohibits juries from assessing the truth or falsity of a defendant's religious beliefs.  Brief and Appendix of Defendant-Appellant Leilani E. Neumann at 34 n.10.

55

absolute as to beliefs but not as to the conduct, which may be regulated for the protection of society."[76]

¶126 As we explained earlier, the Due Process clause "protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children,"[77] but a parent's fundamental right to make decisions concerning a child's care has limitations.  The state's authority is not nullified merely because a parent grounds his or her claim to control the child in religious belief.

¶127 We conclude that the circuit court's instructions regarding religious belief were not in and of themselves erroneous.  We discuss below the parents' contention that because the instructions make no exception for religious beliefs or practice the juries would have been misled to believe that a sincerely held religious belief in prayer treatment was not available in the present cases to the parents as a defense to second-degree reckless homicide.

C

¶128 Even though we conclude that the jury instructions about legal duty and religious belief were not erroneous, we

---

[76] See, e.g., Employment Division, Dep't of Human Resources of Oregon v. Smith, 494 U.S. 872, 878-79 (1990) ("We have never held that an individual's beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate."); Sherbert v. Verner, 374 U.S. 398, 402-03 (1963) (collecting cases); Reynolds v. United States, 98 U.S. 145, 166 (1878) (prohibiting plural marriage even though the prohibition infringed on the free exercise of religion).

[77] Troxel, 530 U.S. at 66.

must address the parents' central contention that these jury instructions, combined with the circuit court's refusal to instruct the jury about the effect of a parent's sincere belief in prayer treatment on the subjective awareness element of second-degree reckless homicide, undermined the parents' ability to defend themselves. According to the parents, a sincere belief in prayer treatment may negate the subjective awareness element. They contend that the instructions told the jury that the parents had a legal duty to provide medical care (regardless of religious belief) and that religious-based conduct could be criminalized, but that the jurors were not instructed that a sincere belief in prayer treatment may negate the subjective awareness element of second-degree reckless homicide.

¶129 The parents contend that as a result of the instructions that were and were not given, the jurors did not understand that they could find a parent not guilty of the crime if they found that the State did not prove beyond a reasonable doubt that the parent in his or her own mind was aware of the risk of death or substantial harm.[78]

---

[78] Professor LaFave observes:

As for the defense of religious belief, it is no interference with one's freedom of religion to convict of manslaughter one who, for religious reasons, fails to call a doctor when to fail to do so constitutes criminal negligence [sometimes referred to in some statutes as criminal recklessness]. Yet an honest religious belief that prayer is a better cure than medicine, that Providence can heal better than doctors, might serve to negative the awareness of risk which is required for manslaughter in those states which use a subjective test of criminal negligence.

¶130 The circuit court rejected the mother's following proffered instruction on the mother's religious belief:

> If Leilani Neumann believed that prayer would heal her daughter, Madeline Kara Neumann, then you must find her not guilty.

¶131 The circuit court rejected this instruction as inaccurately reflecting the law. The focus of a defense to the charged crime, ruled the circuit court, should be on the parent's subjective awareness of the risk involved, not on the parent's subjective belief in the effectiveness of prayer.

¶132 The father did not proffer an instruction relating to religious belief or the effect of a belief in faith-healing on a finding of guilt. During jury deliberations, the jury did submit a question relating to the issue:

> Was Dale's belief in faith-healing something that makes him not liable for not taking Kara to the hospital, even though he was aware to some degree she was not feeling well?

¶133 Unfortunately, the record does not reflect exactly what the circuit court told the jury in response to this question. According to the transcript of the proceedings relating to the jury's questions, the father and the State could not agree on a response for the circuit court to make to the jury's question but did agree to have the circuit court advise the jury to reread the instructions and consider them as given. The father contends that the jury's question demonstrates the

---

2 Wayne R. LaFave, Substantive Criminal Law § 15.4(a) at 525 n.28 (2d ed. 2003).

jury's uncertainty as to whether it could consider his defense of his subjective belief in prayer treatment to the element of subjective awareness.

¶134 As we said in State v. Hubbard, 2008 WI 92, ¶57, 313 Wis. 2d 1, 752 N.W.2d 839, "the necessity for, extent of, and form of reinstruction" is within the trial court's discretion. If the given instructions as a whole correctly state the law, the circuit court's discretionary decision to redirect the jury to those instructions does not warrant a new trial.[79]

¶135 Still, the parents urge that the circuit court's refusal to give any jury instructions about the parents' subjective religious belief, combined with the duty and religious belief instructions given, led to each jury's inadequate understanding of how the sincere belief in prayer treatment could negate a parent's subjective awareness of the risk of death or great bodily harm. They assert that the instruction given——that the parent must be aware that his or her conduct created the unreasonable and substantial risk of death or great bodily harm——is not specific enough for a juror to have understood that the parent's sincere belief in faith healing could be a complete defense. Indeed, the parents claim that the two instructions that they challenge and the failure of the circuit court to instruct on a subjective belief about prayer in

---

[79] State v. Hubbard, 2008 WI 92, ¶57, 313 Wis. 2d 1, 752 N.W.2d 839 (internal citations omitted).

59

effect told the jury that no such defense existed.   Thus the parents conclude that the real controversy was not fully tried.

¶136 The parents do not offer in their briefs in this court a specific instruction on the defense of subjective religious belief.   Rather, they explain the relationship between the requested specific religious belief instruction and the subjective awareness element in terms of causation.

- The mother claims that the parents "must be aware not only that their daughter was experiencing great bodily harm, but that their conduct was causing the great bodily harm."[80]

- The mother maintains that "the reckless homicide statute requires more than mere awareness of the illness; it requires that the defendant is aware that her conduct is causing the illness.   There can be no such awareness of causation if a person believes that prayer, not conventional medicine, is the most likely healing method."[81]

- The father espouses a similar position:   "The [S]tate had to prove that Dale was subjectively aware 'that his conduct **created** the unreasonable and substantial risk of death or great bodily harm.' . . . The defense, in essence, was that if Dale sincerely

_____

[80] Brief and Appendix of Defendant-Appellant Leilani E. Neumann at 35 (emphasis in original).

[81] Brief and Appendix of Defendant-Appellant Leilani E. Neumann at 40 (emphasis in original).

believed treatment through prayer was the best means by which to heal his daughter, he could not, at the same time, have been subjectively 'aware' his treatment by prayer was <u>causing</u> her death. The issue, essentially, is the subjective awareness of <u>causation</u>."[82]

¶137 The parents err in stating the subjective awareness element of the second-degree reckless homicide statute in terms of causation.

¶138 The second-degree reckless homicide statute does not require, as the parents claim, that the actor be subjectively aware that his conduct is a <u>cause</u> of the death of his or her child. The statute and the jury instructions require only that the actor be subjectively aware that his or her conduct <u>created</u> the unreasonable and substantial risk of death or great bodily harm.

¶139 Proper jury instructions are crucial to the fact-finding process.[83] Jury instructions must accurately convey the meaning of the statute as applied to the facts of the case.[84] This court may reverse a conviction pursuant to Wis. Stat. § 751.06 when a jury instruction "obfuscates the real issue or

---

[82] Defendant-Appellant's Brief and Appendix (Dale R. Neumann) at 32 (emphasis and bold in original).

[83] <u>State v. Perkins</u>, 2001 WI 46, ¶41, 243 Wis. 2d 141, 626 N.W.2d 762.

[84] <u>State v. Ferguson</u>, 2009 WI 50, ¶¶14, 31, 317 Wis. 2d 586, Wis. 2d 586, 767 N.W.2d 187.

61

arguably caused the real controversy not to be fully tried."[85] We view the jury instructions in light of the proceedings as a whole and do not review a single instruction in isolation.[86]

¶140 We conclude that a specific instruction on the sincere religious beliefs of the parents, as counsel request on appeal, was not required. The jury instructions regarding the subjective awareness element of second-degree reckless homicide were not erroneous when read with the statute or when read in combination with the other jury instructions. The juries were instructed to consider all the instructions and to consider them as a whole. The instructions adequately instructed the juries about the subjective awareness element. The juries reasonably could have concluded on the basis of the instructions and the record that the parents were subjectively aware that their conduct created the unreasonable and substantial risk of death or great bodily harm and were guilty of second-degree reckless homicide. We therefore will not exercise our discretion to reverse the convictions on the basis of the jury instructions.

D

¶141 The parents next argue that the real controversy was not fully tried because their counsels' performances constituted

---

[85] Perkins, 243 Wis. 2d 141, ¶12.

[86] State v. Lohmeier, 205 Wis. 2d 183, 194, 556 N.W.2d 90 (1996).

ineffective assistance of counsel.[87]  They maintain that their counsel did not ensure that the jury was properly instructed to make clear that a "sincere belief" in treatment through prayer was a defense to the subjective awareness element of second-degree reckless homicide and did not, in their arguments to the jury, explain the connection between prayer and the subjective awareness element of the second-degree reckless homicide statute.

---

[87] Review of an ineffective assistance of counsel claim is review of a mixed question of law and fact.  Thus, the circuit court's findings of fact will not be overturned unless clearly erroneous.  The ultimate determinations of whether counsel's performance was deficient and prejudicial to the defendant are questions of law which this court determines independently of the circuit court but benefiting from its analysis.  State v. Johnson, 153 Wis. 2d 121, 127-28, 449 N.W.2d 845 (1990) (internal citations omitted).

The United States Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984), set forth a two-part test for determining whether counsel's actions constitute ineffective assistance.  The first test requires the defendant to show that his counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Review of counsel's performance gives great deference to the attorney and every effort is made to avoid determinations of ineffectiveness based on hindsight.  Rather, review is from counsel's perspective at the time of trial, and the burden is placed on the defendant to overcome a strong presumption that counsel acted reasonably within professional norms.

Even if counsel's performance is found deficient, a judgment will not be reversed unless the defendant proves that the counsel's deficient performance prejudiced the defense.

The parents appear to join their ineffective assistance of counsel claim with their argument that counsels' ineffective performances justify reversal in the interest of justice.

¶142 We have concluded that the jury instructions were not erroneous and that trial counsel were not deficient for failing to ensure that an additional instruction was given to the jury as requested here.

¶143 The parents also maintain that counsel were deficient for failing to adequately explain the relationship of the sincere religious belief defense and the subjective awareness element.

¶144 The father's counsel did make a sincere religious belief argument in closing.  The mother argues that her trial counsel planned to present a "sincere belief defense," but did a poor job of it and did not make the defense clear enough to the jury.

¶145 Although neither the words "sincere religious belief" nor similar words are in the mother's counsel's closing argument, the mother's counsel did tell the jury that the mother did not understand the severity of Kara's condition; that the mother lacked awareness that her choice of prayer over medical care was life-threatening to Kara; and that as soon as the mother understood that Kara's condition was perhaps beyond prayer, the mother acted.  We agree with the mother that these comments were not a major part of counsel's closing argument.

¶146 Although trial counsel might have explained more fully how the sincere belief defense related to the subjective awareness element, this court will not second-guess trial counsel's selection of trial tactics in the face of alternatives

64

that have been weighed in hindsight.[88]   This court approaches a request for a new trial "with great caution," and we are "reluctant to grant a new trial in the interest of justice.[89] "The [interest of justice] statute [Wis. Stat. § 751.06] was not intended to vest this court with power of discretionary reversal to enable a defendant to present an alternative defense at a new trial merely because the defense presented at the first trial proved ineffective."[90]

¶147 We have reviewed the record and considered the parents' and the State's arguments on reversing the convictions in the interest of justice.   In light of the jury instructions, which were not erroneous, and in light of counsels' closing arguments relating to the subjective awareness element of second-degree reckless homicide, we will not exercise our discretion to reverse the convictions.   We conclude that the real issue in controversy was fully tried.

IV

¶148 The final issue is whether the father's jurors were objectively biased because they were informed that the mother

---

[88] State v. Elm, 201 Wis. 2d 452, 464-65, 549 N.W.2d 471 (Ct. App. 1996).

[89] State v. Armstrong, 2005 WI 119, ¶114, 283 Wis. 2d 639, 700 N.W.2d 98.   See also State v. Avery, 2013 WI 13, ¶38, 345 Wis. 2d 407, 826 N.W.2d 60.

[90] State v. Hubanks, 173 Wis. 2d 1, 29, 496 N.W.2d 96 (Ct. App. 1992).

had previously been convicted of the same crime for which they now had to determine the father's guilt.

¶149 The mother's trial was held first. She was convicted on May 22, 2009. The father's trial was scheduled to begin on July 23, 2009.

¶150 The mother's trial had generated immense publicity in Marathon County. Concerned about the father's right to a fair trial, the circuit court suggested two possible solutions: change of venue or postponement of the trial. The father rejected both suggestions, asserting his right to a speedy trial in Marathon County.

¶151 On the morning jury selection began, the circuit court held an in-chambers conference. No record was made of this in-chambers conference.

¶152 Later that morning, the assistant district attorney and the father's counsel stipulated on the record that each prospective juror would be informed of the mother's prior conviction during individual voir dire. The father and the State apparently feared some jurors would know about the mother's conviction and others would not. The State and the father preferred that all jurors have the same information. Also, the father apparently believed that the circuit court had determined, in chambers and off the record, that knowledge of the mother's conviction alone would not disqualify a person from serving on the father's jury.

¶153 The father now argues that the jurors were objectively biased and that the circuit court erred by not automatically

66

disqualifying any person from the jury pool who knew of the mother's conviction.[91]

¶154 A criminal defendant's right to be tried by impartial and unbiased jurors is guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 7 of the Wisconsin Constitution.[92]  Prospective jurors are presumptively impartial, and the challenger to a juror bears the burden of proving bias.[93]  An inquiry into objective bias of a juror asks whether a reasonable person under the circumstances could be impartial.[94]

---

[91] The State argues that the father did not properly preserve this issue in the circuit court and forfeited or waived the issue on appeal.  See State v. Lewis, 2010 WI App 52, ¶26, 324 Wis. 2d 536, 781 N.W.2d 730 (a failure of a defendant to object on the record to an allegedly prejudicial communication to the jury venire waives the issue for appeal); State v. Williams, 2000 WI App 123, ¶¶19-21, 237 Wis. 2d 591, 614 N.W.2d 11 (failure to object to the impaneling of a biased juror waives the issue for appeal).

We need not address this argument.  Because a record was not made of conversations between the circuit court and counsel on this issue and because of the importance of an unbiased jury, we exercise our discretion to address the issue of jury bias. See State v. Tody, 2009 WI 31, ¶44, 316 Wis. 2d 689, 764 N.W.2d 737 ("Juror bias seriously affects the fairness, integrity, or public reputation of judicial proceedings and is per se prejudicial.").

[92] State v. Faucher, 227 Wis. 2d 700, 715, 596 N.W.2d 770 (1999).

[93] State v. Meehan, 2001 WI App 119, ¶35 n.7, 244 Wis. 2d 121, 630 N.W.2d 722 (citing Irwin v. Dowd, 366 U.S. 717, 723, (1961)).

[94] State v. Kiernan, 227 Wis. 2d 736, 747 n.7, 596 N.W.2d 760 (1999).

¶155 The question whether a juror is objectively biased is a mixed question of fact and law. A circuit court's findings of fact will be upheld unless they are clearly erroneous. Whether those facts fulfill the legal standard of objective bias is a question of law. This court ordinarily decides questions of law independently of the circuit court. A circuit court's conclusion on objective juror bias is, however, intertwined with the facts of the case. Consequently, "it is appropriate that this court give weight to the circuit court's conclusion on that question."[95] This court will "reverse [the circuit court's] conclusion [on a juror's objective bias] only if as a matter of law a reasonable court could not have reached such a conclusion."[96]

¶156 The circuit court made inquiry of each juror to determine whether the person was reasonable and would be willing to set aside knowledge of the mother's conviction in assessing the father's guilt. The circuit court informed each juror about the mother's conviction; told each juror that the information could be used only to assess the mother's credibility, if she testified; and obtained from each juror an assurance that he or she would decide the father's case solely upon the evidence presented. The circuit court told the jurors that "the evidence as to this defendant and how he reacted to the situation may be

---

[95] Faucher, 227 Wis. 2d at 720.

[96] Id. at 721.

different, therefore there may be a different result.  Do you understand that?"

¶157 The circuit court concluded on postconviction motions that it was extraordinary to inform potential jurors of a prior conviction of a co-defendant; that these were extraordinary cases and circumstances; and that the law did not require automatic disqualification of a juror who knew of a co-defendant's conviction.  The circuit court ruled that it "cannot find that trial counsel's agreement [to inform the jurors of the mother's conviction] to be defective performance."  Had the circuit court concluded that the jurors were objectively biased, the circuit court would have had to conclude that trial counsel's stipulation to inform the jurors of the mother's conviction amounted to ineffective assistance by trial counsel.

¶158 We recognize that evidence of a co-defendant's guilt, under some circumstances, can be prejudicial to the defendant on trial, and in cases in other jurisdictions, convictions have been overturned on this ground.

¶159 In the present case, the same charges were brought against the mother and father.  The circumstances of the father and mother were substantially the same.  Nevertheless, circumstances in the present case justified informing the jury about the mother's status.  A speedy trial in the county was requested.  The mother's case had been given immense publicity in the county.  It was important to prevent the jury from inferring that the mother went unpunished or that the father was

69

being singled out for prosecution.[97]   Furthermore, in order to convict the father, the jury had to find that the State proved the father had a subjective awareness that his conduct created an unreasonable and substantial risk of death or great bodily harm to Kara.  The jury was admonished that the mother's and father's circumstances are not precisely the same, that their reactions may be different, and the results of the two trials may be different.

¶160 On our independent review of the record and giving weight to the circuit court's consideration of lack of juror bias, we conclude that the father has not sustained his burden to show that reasonable persons in the juror's position under the circumstances of the instant case could not set aside their knowledge of the mother's conviction.

* * * *

---

[97] United States v. Sanders, 893 F.2d 133, 136-37 (7th Cir. 1990) (after a limiting instruction that co-defendant's guilty plea was not to be considered as evidence against defendant, admission of evidence of co-defendant's guilty plea was proper so that jury was not left to infer that co-defendant went unpunished or that defendant on trial was singled out for prosecution); United States v. McGrath, 811 F.2d 1022, 1024 (7th Cir. 1987) (even when no limiting instruction was given, informing jury of co-defendant's guilt was not prejudicial error; important that jury not infer that defendant had been singled out for prosecution while co-defendant was permitted to go free); United States v. Barrientos, 758 F.2d 1152, 1156 (7th Cir. 1985) (when co-defendant is absent, or disappears mid-trial after pleading guilty, better practice is for court to acknowledge absence and instruct jury that absence is to have no effect on the verdict regarding remaining defendants).

¶161 For the reasons set forth, we conclude that the second-degree reckless homicide statute and criminal child abuse statute provide sufficient notice that the parents' conduct could have criminal consequences if their daughter died. We further conclude that the jury instructions were not erroneous; that trial counsels' performance was not ineffective assistance of counsel; that the controversy was fully tried; and that the jury in the father's case was not objectively biased.

¶162 Accordingly, we affirm the judgments of convictions and orders denying postconviction relief.

¶163 *By the Court.*—The judgments of conviction and orders denying postconviction relief are affirmed.

¶164 DAVID T. PROSSER, J. *(dissenting).* Dale and Leilani Neumann are not likely to be viewed sympathetically by people who read the statement of facts in the majority opinion. The Neumanns' reaction to their daughter's illness was so inconsistent with the normative behavior of most contemporary parents that it is hard for people to identify with them or to understand their thinking and values.

¶165 It would be easy to look away from such unconventional defendants and say nothing. But the issues involved in these cases are too important for me to remain silent. First, the facts are not as black and white as they initially appear. Second, the law governing the facts is imprecise and quite confusing. Finally, the trials of the two defendants were problematic in several respects.

¶166 The primary purpose of this writing is not to try to change the result but to encourage the bench, the bar, and the Wisconsin Legislature to revisit some of the troublesome questions these cases present.

I

¶167 Madeline Kara Neumann, 11, died from diabetic ketoacidosis resulting from untreated juvenile onset diabetes mellitus. Majority op., ¶1. The theory of the prosecution and of the majority is that Kara would still be alive if her parents had provided her with medical care.

¶168 Diabetic ketoacidosis (DKA) is one of the most serious complications of diabetes. Michelle A. Charfen & Madonna Fernández-Frackelton, Diabetic Ketoacidosis, 23 Emergency Med.

Clinics N. Am. 609, 609 (2005). It is a life-threatening condition that requires prompt hospitalization and treatment. Malcolm Nattrass, Diabetic ketoacidosis, 34 Med. 104, 104 (2006). Even minor delays in recognizing the condition can have an effect on survival. Id. DKA results from insulin deficiency and excess insulin counter-regulatory hormones. Charfen, supra, at 609. Before the discovery of insulin in 1921, DKA caused death in 100 percent of cases, but now that insulin is available for treating diabetes, DKA's rate of mortality has declined to between four percent and ten percent. Id. However, mortality rates are higher when patients seek treatment from non-specialists. Lynne Jerreat, Managing diabetic ketoacidosis, 24 Nursing Standard 49, 50 (Apr. 28, 2010). Every year, there are approximately 100,000 hospitalizations for DKA in the United States, and new-onset diabetics make up 30 percent of patients who develop DKA. Charfen, supra, at 610.

¶169 DKA often causes vague symptoms like fatigue, nausea, vomiting, and abdominal pain. Id. In addition, patients often complain of excessive urination, thirst, and hunger, which are more suggestive of DKA. Id. Roughly 25 percent of patients produce vomit with a coffee ground appearance. Id. Patients with DKA appear exhausted and dehydrated and may have Kussmaul respirations, a "pattern of deep, sighing respirations." Id. at 613. Also, the breath of DKA patients may have a fruity odor due to acetone in their breath. Id. However, not everyone can smell ketones, so the fruity smell is not always a reliable way to diagnose the condition. Jerreat, supra, at 49. DKA patients

2

may not be entirely conscious as the condition progresses, and in severe cases, the patient may slip into a coma. Charfen, supra, at 613-14. Symptoms such as acute abdominal pain could result from a variety of conditions, and non-specialists, as opposed to endocrinologists, may be more likely to order extra diagnostic tests and procedures that delay diagnosis. Claresa S. Levetan, Kathleen A. Jablonski, Maureen D. Passaro, & Robert E. Ratner, Effect of Physician Specialty on Outcomes in Diabetic Ketoacidosis, 22 Diabetes Care 1790, 1793 (1999).

¶170 DKA is more common in children under five years of age and in children whose families lack access to proper health care. Joseph Wolfsdorf, Nicole Glaser, & Mark A. Sperling, Diabetic Ketoacidosis in Infants, Children, and Adolescents, 29 Diabetes Care 1150, 1151 (2006). A recent survey revealed that children are at a higher risk of developing DKA if their parents have low incomes and low educational achievements. Id. DKA is also more prevalent when the family does not have health insurance because the parents delay seeking treatment. Id.

¶171 In this case, the majority opinion explains that "Kara had suffered gradually worsening symptoms for a few weeks before her death, leading to frequent thirst and urination, dehydration, weakness, and exhaustion." Majority op., ¶11. The parties stipulated, however, that "to the casual observer, . . . Kara would have appeared healthy as late as the Thursday before she died." Id.

¶172 According to the majority, Kara did some of her homework on Friday, March 21, 2008, but was too tired to finish.

3

Id., ¶12. She ate dinner in her bedroom. Id. The majority does not state whether either of the Neumanns remained at home during the day on Friday, but one of the briefs asserts that Leilani Neumann came home from work about 6:00 p.m.

¶173 On Saturday, Kara had the capacity to ask her parents whether she could stay home instead of going to work at the family's coffee shop. Id. Leilani left to work at the shop, returning home Saturday afternoon. Id. According to his brief, Dale stayed home to work on the family's taxes. When Leilani arrived home she "knew that something was wrong [with Kara] and called her husband into the room. The parents began rubbing Kara's legs and praying for her." Id.

¶174 From the facts set out in the majority opinion, it appears that the critical time period to examine is the period from Saturday afternoon, when Leilani returned from work, to Sunday afternoon when Kara died.

¶175 When Leilani returned home, "Kara was pale and her legs were skinny and blue." Id. She had slept all day. Id. The parents realized that their daughter was ill and they began to pray, and to enlist others to pray as well. Id., ¶¶13, 15-16.

¶176 Paragraphs 17-27 of the majority opinion describe the last 23-24 hours of Kara's life. There are facts and descriptions in the State's briefs that paint an even more disturbing picture of events than the account in the majority opinion. However, there are representations of fact in the

4

briefs of the two defendants that lay out a different, more optimistic view of the situation.

¶177 There is some dispute about when Kara went into a coma. A coma is a "state of deep, often prolonged unconsciousness . . . in which an individual is incapable of sensing or responding to external stimuli and internal needs." The American Heritage Dictionary of the English Language 376 (3d ed. 1992). A coma is often described as a state in which a person cannot be awakened and does not respond normally to light, sound, or painful stimuli.

¶178 The majority states that the Neumann juries could find that Kara was "in a coma-like condition for 12 to 14 hours." Majority op., ¶86. The statement appears to be consistent with representations in Dale's brief that, on Sunday morning, Kara moved her head and moaned in response to attempts to communicate with her. It is not consistent with representations that Kara was in a coma for many hours before her death.

¶179 In the majority opinion, there is no assertion that Kara vomited or that any vomit had a coffee ground appearance. There is no representation that the Neumanns suspected or were told that their daughter had a diabetic condition or that they detected a fruity odor on Kara's breath.

¶180 The majority acknowledges the Neumanns' continuing (though clearly mistaken) belief that Kara had a fever or the flu, and their mistaken perception that, on Sunday morning, she was marginally better than she had been. See id., ¶¶17, 20. The majority emphasizes the Neumanns' reservations about their

5

conduct and the advice of those who suggested that they do more for their daughter. It does not mention that such advice was not universal.

¶181 DKA is a very dangerous condition but it is not always a condition whose gravity is quickly recognized.[1] To illustrate, DKA was at issue in a medical malpractice case decided by this court in 2004. Maurin v. Hall, 2004 WI 100, 274 Wis. 2d 28, 682 N.W.2d 866, overruled by Bartholomew v. Wis. Patients Comp. Fund, 2006 WI 91, 293 Wis. 2d 38, 717 N.W.2d 216.

¶182 During the first few days of March 1996, five-year-old Shay Leigh Maurin had not been feeling well. Id., ¶10. "She was lethargic, drinking fluids all day and eating poorly." Id. Shay's mother took her to a clinic on March 5 where a physician assistant examined her. Id. He diagnosed the child as having an ear infection and prescribed antibiotics. Id. However, he "advised that Shay should have a fingerstick blood test——used to check for diabetes——if her symptoms did not improve." Id.

¶183 "Shay's condition worsened rapidly over the next 24 hours. She was unable to eat, she vomited and dry-heaved, and the fruity odor of her breath led her mother to fear she might have diabetes." Id., ¶11. The mother brought Shay to a

---

[1] By contrast, other life-threatening conditions are more easily recognized. See, e.g., Shawn Francis Peters, When Prayer Fails: Faith Healing, Children, and the Law 136–39 (2008) (discussing Commonwealth v. Barnhart, 497 A.2d 616 (Pa. Super. Ct. 1985)). Two-year-old Justin Barnhart had an abdominal tumor that grew over the course of the summer and left his abdomen distended. Peters, supra at 136. Justin's parents treated him with prayer even as Justin grew so thin that his bones were visible through his skin. Id. Justin's parents were convicted of involuntary manslaughter. Barnhart, 497 A.2d at 630.

hospital late in the evening of March 6. Id. At this point, according to the opinion, "Shay's diabetes had progressed to acute diabetic ketoacidosis." Id. However, the hospital physician who examined her failed to diagnose any diabetic condition. Id.

¶184 The following morning, March 7, when Shay returned to the hospital, she was in serious pain. Id., ¶12. A different doctor diagnosed acute DKA "and attempted treatment before transferring Shay to Children's Hospital of Wisconsin. Shay lost consciousness during the ambulance ride to [the hospital] and died the next day," March 8. Id.

¶185 In retrospect, it is hard to imagine how the first doctor at the hospital failed to diagnose the situation, but he did. According to the facts in the opinion, the child was placed in an ambulance before she lost consciousness. Because she died the next day, she must have been under medical care for at least 12 hours.

¶186 The facts in Maurin are at odds with the majority's black and white narrative here and suggest that DKA does not manifest the same symptoms or follow the same timeline in every case.

¶187 I do not read the majority opinion as faulting the Neumanns for failing to diagnose Kara as having DKA. I read the majority opinion as holding that the Neumanns, after observing Kara's condition, had a duty to provide her with medical care because the failure to do so created an unreasonable and substantial risk of death or great bodily harm (that is, bodily

7

injury which creates a substantial risk of death or other enumerated physical injuries). According to the majority, the Neumanns were aware of "that risk," and their failure to provide medical care caused Kara's death.

¶188 The overriding issue in this case is whether the Wisconsin Statutes gave the Neumanns fair notice of their "duty" to act. A larger issue is how this parental "duty" will be interpreted in cases where a parent is confronted with similar symptoms that do not arise from DKA.

II

¶189 Wisconsin Stat. § 940.01(1)(a) reads in part: "[W]hoever causes the death of another human being <u>with intent to kill</u> that person or another is guilty of a Class A felony." Wis. Stat. § 940.01(1)(a) (emphasis added). This statute, which has no relationship whatsoever to the present case, is generally regarded as the most serious homicide statute. It is cited here merely to highlight the element of intent. The phrase "with intent to" is defined in Wis. Stat. § 939.23 (Criminal intent) in subsection (4) as follows: "'With intent to' or 'with intent that' means that the actor either has a purpose to do the thing or cause the result specified, or is aware that his or her conduct is practically certain to cause that result." Wis. Stat. § 939.23(4).

¶190 Proving intent can be a challenge for prosecutors, but establishing criminal intent demonstrates culpability.

¶191 Wisconsin Stat. § 948.21 is the child neglect statute. This statute reads, in part:

8

(1) Any person who is responsible for a child's welfare who, through his or her actions or failure to take action, intentionally contributes to the neglect of the child is guilty of one of the following:

(a) A Class A misdemeanor.

(b) A Class H felony if bodily harm is a consequence.

(c) A Class F felony if great bodily harm is a consequence.

(d) A Class D felony if death is a consequence.

Wis. Stat. § 948.21(1).

¶192 Wisconsin Stat. § 948.21(1)(d) does have a relationship to this case. It is directed toward "[a]ny person," including a parent, "who is responsible for a child's welfare." Wis. Stat. § 948.21(1) (emphasis added). It specifically contemplates a "failure to take action" that "contributes to the neglect of the child." Id. Wisconsin juries have long been told that "[a] child is neglected when the person responsible for the child's welfare fails for reasons other than poverty to provide necessary care, food, clothing, medical or dental care, or shelter so as to seriously endanger the physical health of the child." Wis JI——Criminal 2150; see also State v. Evans, 171 Wis. 2d 471, 481, 492 N.W.2d 141 (1992); cf. Wis. Stat. § 48.02(12g) (defining neglect).

¶193 The penalty for child neglect that results in a child's death is a Class D felony. Wis. Stat. § 948.21(1)(d). This is the same as the penalty for a violation of Wis. Stat. § 940.06, second-degree reckless homicide.

9

¶194 Unlike Wis. Stat. § 940.06, however, Wis. Stat. § 948.21, the child neglect statute, contains an intent element. A person cannot be convicted under the child neglect statute unless the person "<u>intentionally</u> contributes to the neglect of the child." (Emphasis added.)

> "Intentionally" means that the actor either has a purpose to do the thing or cause the result specified, or is aware that his or her conduct is practically certain to cause that result. In addition, . . . the actor must have knowledge of those facts which are necessary to make his or her conduct criminal and which are set forth after the word "intentionally[.]"

Wis. Stat. § 939.23(3).

¶195 In prosecuting the Neumanns, the State either overlooked or consciously chose not to prosecute under Wis. Stat. § 948.21(1)(d). The State's decision avoided the necessity of proving intent. Instead, the State charged the defendants, in separate cases, with second-degree reckless homicide: "Whoever recklessly causes the death of another human being is guilty of a Class D felony." Wis. Stat. § 940.06(1).

¶196 This statute requires a lot of interpretation. To explain "recklessly," the majority turns to the definition of "criminal recklessness" in Wis. Stat. § 939.24(1): "'[C]riminal recklessness' means that the actor creates an unreasonable and substantial risk of death <u>or</u> great bodily harm to another human being and the actor is aware of that risk." (Emphasis added.) The defined term is then converted to an adverb for use in Wis. Stat. § 940.06.

¶197 The statutory definition of "criminal recklessness" contemplates an actor creating an unreasonable and substantial

risk of death <u>or</u> an unreasonable and substantial risk of great bodily harm <u>and</u> being "aware of that risk."  Wis. Stat. § 939.24(1).  This requires consideration of the definition of "great bodily harm," which is defined, in part, as "bodily injury which creates a substantial risk of death."  Wis. Stat. § 939.22(14).

¶198 There is no statutory definition of "creates" or "substantial risk" or "aware" to turn to in applying "criminal recklessness."

¶199 Wisconsin Stat. § 940.06, the second-degree reckless homicide statute, appears to be simple enough to apply when a person is creating an unreasonable risk of serious harm to another by the person's action.  For example, shooting a gun in the direction of a crowd of people creates an unreasonable and substantial risk of death or great bodily harm.  The statute is more difficult to apply when the person is not acting but failing to take action.

¶200 In the present case, many people failed to act: Kara's parents, her siblings, her grandparents, some of the people who visited the Neumann family at their home.  All these people could have acted to alert authorities or summon medical care, but they did not.  Only the Neumanns have been prosecuted because, presumably, only the Neumanns had a "duty" to act.  Thus, enforcement of the statute requires us to determine who had a duty to act and what that duty was.  These elements must be imported into the reckless homicide statute.

11

¶201 Wisconsin Stat. § 940.23(2)(a) is the second-degree reckless <u>injury</u> statute. It reads: "Whoever recklessly causes great bodily harm to another human being is guilty of a Class F felony." This statute also requires us to examine definitions of "recklessly" and "great bodily harm." <u>See</u> Wis. Stat. §§ 939.24(1), 939.22(14). The majority appears to believe that the Neumanns could have been prosecuted under § 940.23(2)(a) for their failure to take action to provide medical care for Kara even if she had lived.

¶202 What is confusing, however, is that Wis. Stat. § 940.23(2)(a) appears to be very close to Wis. Stat. § 948.03(3)(a), which reads: "Whoever recklessly causes great bodily harm to a child is guilty of a Class E felony." The former statute refers to the victim as "another human being," whereas the latter refers to "a child." Otherwise, the two statutes use the same words and reach at least some of the same conduct.[2]

¶203 Significantly, subsection (6) of Wis. Stat. § 948.03 then provides:

> Treatment through prayer. A person is not guilty of an offense under this section solely because he or she provides a child with treatment by spiritual means through prayer alone for healing in accordance with the religious method of healing permitted under s. 48.981(3)(c)4. or 448.03(6) in lieu of medical or surgical treatment.

---

[2] <u>See also</u> Wis. Stat. § 948.03(3)(c) ("Whoever recklessly causes bodily harm to a child by conduct which creates a high probability of great bodily harm is guilty of a Class H felony.").

¶204 The majority is undaunted by the clear overlapping of Wis. Stat. § 940.23(2)(a), the second-degree reckless injury statute, and Wis. Stat. § 948.03(3)(a) in terms of a person's action or inaction. The majority points out that the immunity granted in § 948.03(6) applies only to § 948.03. Majority op., ¶50. It asserts that the definition of "recklessly" in Wis. Stat. § 940.06 and, by implication, § 940.23, is different from the definition of "recklessly" in § 948.03 and Wis. Stat. § 939.24(1). Id., ¶73. It declares that it "is apparent . . . in reading the text of the statutes, that the phrase 'great bodily harm' is used in different ways in these statutes." Id., ¶65.

¶205 It is true that the immunity granted by Wis. Stat. § 948.03(6) applies only to § 948.03. But as long as that immunity exists, it creates uncertainty about whether specific conduct is immune from prosecution.

¶206 The majority attacks this uncertainty, first, by declaring that "[n]o one reading the treatment-through-prayer provision should expect protection from criminal liability under any other statute," majority op., ¶50, which would include the unmentioned, overlapping Wis. Stat. § 940.23(2)(a), and, second, by hinting that the immunity in Wis. Stat. § 948.03(6) should be limited through judicial construction. Id., ¶51. But there is still confusion in the law.

¶207 The different definitions of "recklessly" demonstrate how "great bodily harm" operates differently in the two separate statutory schemes. In Wis. Stat. § 940.06, "great bodily harm"

13

is incorporated into the definition of recklessness to describe the <u>nature</u> of the prohibited conduct, whereas in Wis. Stat. § 948.03(3)(a) "great bodily harm" is used to describe the <u>result</u> of the prohibited conduct. Section 940.06(1) prohibits reckless conduct that results in death, where the reckless conduct means an action that "creates an unreasonable <u>and</u> <u>substantial risk of</u> death or <u>great bodily harm</u>." Wis. Stat. § 939.24(1) (emphasis added). In contrast, § 948.03(3)(a) prohibits reckless conduct that <u>causes great bodily harm</u>, where the reckless conduct means "conduct which creates a situation of unreasonable <u>risk of harm</u>." Wis. Stat. § 948.03(1) (emphasis added). Thus, the difference is that Wis. Stat. § 940.06(1) prohibits behavior that creates a greater risk (great bodily harm), whereas Wis. Stat. § 948.03(3)(a) prohibits behavior that creates a smaller risk (harm).

¶208 If the difference between the use of "great bodily harm" in Wis. Stat. § 940.06(1) and Wis. Stat. § 948.03(3)(a) saves the two statutes from a collision, the same cannot be said of § 948.03(3)(c). Section 948.03(3)(c) inexplicably states, "[w]hoever recklessly causes bodily harm to a child by conduct which creates a high probability of great bodily harm is guilty of a Class H felony." Wis. Stat. § 948.03(3)(c). This section is severely flawed because it contains a double description of the prohibited conduct. Section 948.03 uses "recklessly" to mean conduct that "creates a situation of unreasonable risk of harm," § 948.03(1), but the statute goes further to define the prohibited conduct as that "which creates a high probability of

14

great bodily harm."  Wis. Stat. § 948.03(3)(c).  It is this definition of prohibited conduct within § 948.03(3)(c) that destroys fair notice.

¶209 Wisconsin Stat. § 940.06(1) and Wis. Stat. § 948.03(3)(c) regulate the same conduct and therefore do not provide fair notice.  The "high probability of great bodily harm" in § 948.03(3)(c) is almost identical to the "substantial risk of death or great bodily harm" in Wis. Stat. § 940.06(1). See Wis. Stat. § 939.24 (defining criminal recklessness as it applies to § 940.06(1)).  It is possible to quibble over whether "high probability of great bodily harm" is more or less severe than "substantial risk of great bodily harm," but criminal liability should not depend on an unwinnable battle over semantics.  Therefore, Wis. Stat. § 940.06(1) and Wis. Stat. § 948.03(3)(c) prohibit the same conduct and differ only by the prohibited result.  Since § 948.03(6) provides a treatment-through-prayer immunity for the conduct in § 948.03(3)(c), the parents should not be liable for that same conduct under Wis. Stat. § 940.06(1).

¶210 In addition to the different uses of "great bodily harm" and different definitions of "recklessly," the majority suggests that the subjective awareness requirement in Wis. Stat. § 940.06(1) mitigates any vagueness because it requires the actor to be aware of the unlawfulness of the conduct.  Majority op., ¶77.  However, that reasoning is not persuasive where the vagueness makes it impossible for parents to know what conduct is unlawful.  Under the Neumanns' interpretation of the statute,

15

it was perfectly lawful for them to create a high probability of great bodily harm because the treatment-through-prayer immunity in Wis. Stat. § 948.03(6) allowed that conduct. Therefore, it is hard to see how being subjectively aware of a risk that the parents believed was lawful could assuage vagueness that makes it impossible to determine when conduct is not lawful.

¶211 The word "aware" in the Wis. Stat. § 939.23 definition of "intentionally" (that is, "aware that his or her conduct is practically certain to cause [a] result") should be contrasted with the word "aware" in the Wis. Stat. § 939.24 definition of "criminal recklessness" ("aware of that risk"). When "that risk" is not definite, the awareness of "that risk" cannot be definite, either.

¶212 The majority opinion explains that the due process issue in these prosecutions is "whether the applicable statutes are definite enough to provide a standard of conduct for those whose activities are proscribed." Majority op., ¶33.

> Fair notice is part of the due process doctrine of vagueness. "[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application[,] violates the first essential of due process of law."

Id. (quoting Connally v. Gen. Constr. Co., 269 U.S. 385, 391 (1926)).

¶213 The Neumanns claim that the reckless homicide statute is too murky to give sufficient notice as to when parental choice of treatment through prayer becomes illegal. Given the nature of Kara's illness, as well as the imprecision in the

16

statutory language, I agree. There is a due process problem here. On the facts before us, the statutes are very difficult to understand and almost impossible to explain. Indeed, the statutory scheme is so difficult to explain that if a prayer-treating parent were to consult an attorney on how he or she could prayer treat and stay within the bounds of the law, virtually any attorney would be at a loss to reasonably advise the client. The concerns stated would not have been so pronounced if the Neumanns had been prosecuted under the child neglect statute, Wis. Stat. § 948.21(1)(d).

III

¶214 The second-degree reckless homicide statute (Wis. Stat. § 940.06) is different from the child neglect statute (Wis. Stat. § 948.21) in that it does not include any explicit language authorizing the prosecution of death caused by omission. The Neumanns concede, however, that defendants may be prosecuted for reckless homicide if they violate a known legal duty to act. State ex rel. Cornellier v. Black, 144 Wis. 2d 745, 758, 425 N.W.2d 21 (Ct. App. 1988).

¶215 In Cornellier, the court said:

> It is just as much an "act" to deliberately or recklessly refrain from performing a known legal duty as it is to negligently perform that duty. We conclude, therefore, that the statute, impliedly, if not directly, acknowledges that the crime of reckless homicide may be committed by omission, as well as commission.

Id.

¶216 This principle may be sound but the truth is that Cornellier was decided under a statute that was repealed and was

17

different from the current statute. The former statute read as follows:

> Homicide by reckless conduct. (1) Whoever causes the death of another human being by reckless conduct is guilty of a Class C felony.
>
> (2) Reckless conduct consists of an act which creates a situation of unreasonable risk and high probability of death or great bodily harm to another and which demonstrates a conscious disregard for the safety of another and a willingness to take known chances of perpetrating an injury. It is intended that this definition embraces all of the elements of what was heretofore known as gross negligence in the criminal law of Wisconsin.

Wis. Stat. § 940.06 (1985–86).

¶217 Cornellier also was heavily influenced by an alleged omission case, State v. Williquette, 129 Wis. 2d 239, 385 N.W.2d 145 (1986). Williquette also was decided under a different statute, Wis. Stat. § 940.201 (1983–84), which provided, in part, "[w]hoever . . . subjects a child to cruel maltreatment, including . . . severe bruising, lacerations, fractured bones, burns, internal injuries or any injury constituting great bodily harm . . . is guilty of a Class E felony." Williquette, 129 Wis. 2d at 242 n.1 (quoting Wis. Stat. § 940.201) (emphasis added). The word "subjects" can mean "[t]o expose to something"[3] in contrast, say, to bruise, cut, fracture, or burn. "Exposing" a person to danger may be viewed as an "act" or as a failure to act through passivity.

---

[3] The American Heritage Dictionary of the English Language 1788 (3d ed. 1992).

18

¶218 In any event, both <u>Williquette</u> and <u>Cornellier</u> speak, directly or indirectly, of a defendant's failure to perform a "known legal duty." This inevitably presents the question of what "known legal duty" the Neumanns failed to perform.

¶219 The Neumanns' "known legal duty" had to be inserted into the standard jury instruction for second-degree reckless homicide. <u>See</u> Wis JI——Criminal 1060. The jury instruction in Leilani Neumann's case read as follows:

> Second-degree reckless homicide is defined in Section 940.06 of the Criminal Code of Wisconsin, and it's committed by one who recklessly causes the death of another human being. Before you may find the defendant guilty of second-degree reckless homicide, the [State] must prove by evidence which satisfies you beyond a reasonable doubt that the following two elements were present.

> First, the defendant caused the death of Madeline Kara Neumann. "Cause" means that the defendant's conduct was a substantial factor in producing the death. <u>Conduct can be either by an act or an omission when the defendant has a duty to act.</u>

> <u>One such duty is the duty of a parent to protect their children, to care for them in sickness and in [health], and to do whatever is necessary for their preservation, including medical attendance, if necessary.</u>

(Emphasis added.) The emphasized language was added by the circuit court to the standard jury instruction.

¶220 The instructions in Dale Neumann's case changed the explanation of duty: "One such duty is the duty of a parent to protect their children, to care for them in sickness and in health."

¶221 There is obviously a distinction between the two instructions. Dale's instructions do not use the word "medical"

19

at all. Neither instruction uses the phrase "provide medical care when necessary." See majority op., ¶¶100, 104. Neither instruction refers to a "known legal duty." There was imprecision in the circuit court's instructions because these cases were breaking new ground.

¶222 An unresolved question is whether the prayer treatment immunity provision in Wis. Stat. § 948.03(6) modifies a parent's "duty" to provide medical care and, if so, when and how.

¶223 The duty question would have been answered in a prosecution under the child neglect statute. But here, in prosecutions for second-degree reckless homicide under Wis. Stat. § 940.06, the court had to make up an answer, suggesting that a "legal duty" was not clear. See Majority op., ¶¶109, 111. This underscores the inadequate notice provided to the Neumanns.

IV

¶224 There are several aspects of the Neumann trials that are problematic.

A. Jury Instructions

¶225 As noted above, the jury instructions with respect to "duty" are not consistent and may not provide a clear, accurate statement of parental duty.

¶226 The standard jury instruction for second-degree reckless homicide reads in part: "If you are satisfied beyond a reasonable doubt that the defendant caused the death of (name of victim) by criminally reckless conduct, you should find the defendant guilty of second degree reckless homicide. If you are

20

not so satisfied, you must find the defendant not guilty." Wis JI——Criminal 1060.

¶227 The circuit court followed the instruction closely in Dale Neumann's case. In Leilani Neumann's case, however, the key paragraph is substantially rewritten to read:

> If you are satisfied beyond a reasonable doubt that the defendant directly committed all of the two elements of second-degree reckless homicide or that the defendant intentionally aided and abetted the commission of that crime, you should find the defendant guilty. If you are not so satisfied, then you must find the defendant not guilty.

¶228 The revised paragraph's reference to intentionally aiding and abetting "the commission of that crime," combined with the deletion of the phrase "caused the death of [name of victim]" muddles an already confusing legal analysis.

¶229 The jury instructions make no reference to the religious motivation of the defendants. It may be true that the defendants were not entitled to rely——in the jury instructions—— on the treatment-through-prayer provision in Wis. Stat. § 948.03(6). However, the sole reference to religion in the jury instructions——"The Constitutional Freedom of Religion is absolute as to beliefs but not as to conduct which may be regulated for the protection of society"——can only be viewed as a repudiation of the defendants' position and a legal ruling that any "duty" imposed upon parents to provide medical care for their children is the same for prayer-treating parents as it is for other parents.

B. Decisions on Dale's Jury

21

¶230 Prior to voir dire in Dale Neumann's case, counsel for the defendant and the State met in Judge Vincent Howard's chambers and had an off-the-record discussion about how a jury's knowledge of Leilani Neumann's prior conviction for the same crime would be treated. Dale Neumann's counsel claimed that he objected to allowing any jurors with knowledge of the prior conviction to be on the panel, reasoning that "knowledge of the prior conviction would have to influence" a juror's decision in Dale Neumann's case.

¶231 Again, there is no record of this in-chambers discussion, and thus no record of counsel's objection to jurors with prior knowledge of Leilani Neumann's conviction. In his written decision on Dale and Leilani Neumann's joint post-conviction motion, Judge Howard acknowledged that he probably "remarked off the record that prior knowledge alone does not necessarily disqualify a juror." Faced with what appeared to be a ruling from the judge and the possibility that some jurors had knowledge of Leilani Neumann's conviction while some did not, Dale Neumann's counsel and the State agreed that all jurors should be informed of the wife's conviction rather than risk this fact being revealed during deliberations.

¶232 It is troubling that Dale Neumann's jury was informed of Leilani Neumann's conviction, especially since the underlying facts were the same, the law was the same, and the parents appear to have made their decisions jointly in the last 24 hours of Kara's life. It is hard to believe that a reasonable person in a juror's position at Dale Neumann's trial could have avoided

22

being influenced by the result in Leilani Neumann's trial. Cf. State v. Faucher, 227 Wis. 2d 700, 718-19, 596 N.W.2d 770 (1999).

¶233 Another concern arising out of the absence of a transcript of the in-chambers meeting is that we do not know whether Dale Neumann was present at that meeting. If he was not present, he did not hear vital discussion about potential jurors having knowledge about Leilani's prior conviction. That discussion could have affected his strategy and decision and might have changed the result of his trial.

V

¶234 This case is a tragedy in virtually every respect. I cannot say that the result of the Neumann trials is unjust. Nonetheless, there were and are serious deficiencies in the law and they ought to be addressed by the legislature and the courts. Failing to acknowledge these deficiencies will not advance the long-term administration of justice.

¶235 For the foregoing reasons, I respectfully dissent.

23